REDLAND INSURANCE COMPANY, Plaintiff-Appellee, v. RONNA LERNER, as Ex'x or Adm'x of the Estate of Nora Bergman, Deceased, *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—03—2657

Opinion filed February 10, 2005.

Belgrade & O'Donnell, P.C., of Chicago (Steven B. Belgrade, of counsel), and Dougherty, Ryan, Giuffra, Zambito & Hession, of New York, New York (James E. Ryan, of counsel), for appellants.

Stellato & Schwartz, Ltd., of Chicago (Esther Joy Schwartz and Richard D. Foody, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Defendants Ronna Lerner, as executrix or administratrix of the estate of the late Nora Bergman, Zurich American Insurance Company, individually and as assignee of the estate of the late Nora Bergman, and Ace Fire Underwriters Insurance Company USA, individually and as assignee of the estate of the late Nora Bergman, and as administrator and f/u/o John Doe Insurance Company (collectively Zurich), appeal an order of the circuit court of Cook County granting summary judgment in a declaratory judgment action filed by plaintiff Redland Insurance Company (Redland), which sought a declaration that it was not required to indemnify Lerner.

The record discloses that this dispute arises from the conversion of an original oil painting by Pablo Picasso entitled "Nu Accroupi." The painting had been owned by Nora Bergman; her estate decided to sell it in September 1999, following her death in 1998.

During the relevant time period, the painting was insured by a first-party property insurance policy issued by Redland. The Redland policy provided in part that Redland agreed to pay "the agreed value in the schedule" for any covered total loss to scheduled articles, including the painting. The agreed value for the painting listed in the schedule was $858,000.

The Redland policy also included the following provisions in the "General Conditions" portion of the policy:

"4. Your duties After Loss. In case of a loss to which this insurance may apply, you will see that the following duties are performed:
***

B. **Notice of Loss**—Report as soon as practicable in writing to us or our authorized representative any loss or damage which may become a claim under this policy.

C. **Proof of Loss**—File with us, or our authorized representative, a detailed proof of loss signed and sworn by you setting forth to the best of your knowledge and belief the facts of the loss and the amount thereof within 90 days after discovery of the loss.

5. **Examination Under Oath.** You agree:

A. to be examined under oath;

B. to produce such records as we may need to verify the claim and its amount; and to permit copies of such records to be made if needed.

6. **Loss Payment.** Unless a claim has been paid by others, we will pay any loss covered under this policy within 60 days after we reach an agreement with you, entry of final judgment, or the filing of an appraisal award with us.

\*\*\*

8. **Claim Against Others.** In the event of a loss which we believe may be collectible from others, we may pay in the form of a loan to be repaid out of any recoveries from others. You will cooperate in any way possible to assist in such recovery from others and we shall, at our expense, take over your rights against others to the extent of our payment.

\*\*\*

10. **Other Insurance.** If at the time of loss or damage there is available any other insurance which would apply to the property in the absence of this policy, the insurance under this policy will apply only as excess insurance over the other insurance."

The estate first gave the painting to Christie's auction house to sell on consignment, but this effort was unsuccessful.

The estate later entered into an agreement with the Richard Gray Gallery to sell the painting on consignment. The agreement provided in part that the painting remain in the sole custody and control of the Richard Gray Gallery. The agreement also provided that the painting could not be sold for less than $2 million net to the estate.

On December 22, 2000, the Richard Gray Gallery allowed an art dealer named Michel Cohen to remove the painting from the premises to show to a potential buyer. Cohen later told Richard Grey that the painting was sold for $2.2 million. Cohen tendered a check for $2.1 million, with the $100,000 difference representing Cohen's commission on the sale. Cohen then stopped payment on the check. It was later learned that the painting had been valued at $4.5 million and that Cohen had sold the painting for an amount in excess of $4 million.

On March 20, 2001, the estate sued the Richard Gray Gallery and Zurich to collect the value of the painting. Zurich had issued a Fine Art Dealers' Association of America insurance policy to the Richard Gray Gallery. The Zurich policy contained a "Property Insured Provision" that required the insurers to pay for any loss or damage to fine arts belonging to third parties, regardless of fault. The declared value of the painting under the Zurich policy was $2 million. The Zurich policy also contained a "Legal Liability Coverage" section which covered the Richard Gray Gallery for liability as a bailee of others' property.

Also on March 20, 2001, the estate notified Redland of the loss of the painting, including the circumstances thereof. Redland began to investigate the matter. On May 3, 2001, Redland sent the estate a letter requiring more information and documents for proof of loss and stating a reservation of rights.

Richard Peterson, an attorney for Redland, states in an affidavit that on May 31, 2001, his colleague, Richard Foody, spoke to Omri Praiss, an attorney for the estate. Praiss told Foody that the estate did not intend to supply the requested information, as the estate expected to resolve the claim through payment to the estate by the Richard Gray Gallery and its insurers.

Omri Praiss states in an affidavit that he had numerous conversations with Foody and Peterson, during which he advised them he was in the process of negotiating a comprehensive settlement with the Richard Gray Gallery and its insurers. Praiss advised them that the Richard Gray Gallery and its insurers intended to pay the estate more than $2 million. Praiss stated that he indicated to Foody and Peterson that it made no sense to gather and produce the voluminous records and that Foody and Peterson agreed.

On June 8, 2001, Redland sent another letter to the estate acknowledging the May 31, 2001, conversation. The letter also stated that it had not received the additional information sought and reminded the estate of general conditions 5 and 8 of its policy. The letter also stated that Redland was not pressing the matter at this time due to the settlement negotiations. The letter added that: "To the extent you recover at least the limits of liability as stated in the Redland schedule for this painting, we presume that you are not pursuing any claim against Redland under the Valuable Personal Articles Policy." The letter also warned that if the matter was settled for less than the amount stated in the Redland policy, the estate may not sign a release or agreement that jeopardizes any rights of recovery Redland may have and will be expected to comply with the May 31 request for additional information.

Praiss states in his affidavit that "[a]t *no* time did Mr. Peterson, Mr. Foody or any other representative of Redland purport to limit, in any way, the estate's right to settle the Litigation in an amount greater than $858,000. They also did not seek to prevent the Estate from assigning its rights under the Redland policy to a third party." (Emphasis in original.)

On July 2, 2001, the estate settled the dispute under the Zurich policy. In exchange for $2,005,000 from Zurich and $5,000 from Gray, the estate executed a release and assignment agreement, as well as a subrogation and assignment agreement, releasing the estate's claims against the Richard Gray Gallery and Zurich, and assigning the estate's interests in the painting and the Redland policy to Zurich, agreeing to cooperate with Zurich in its efforts to recover the insured value under the Redland policy.

On March 1, 2002, Redland filed the declaratory judgment action

at issue here, seeking a declaration that it had no duty to indemnify the estate or its assigns for any loss arising from the conversion of the painting. Redland moved for summary judgment in February 2003. Following the submission of memoranda supporting and opposing the motion, the trial court entered an order granting Redland's motion on August 4, 2003. Zurich now appeals.

The issue on appeal is whether the trial court erred in granting summary judgment. Thus, the issue is whether the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Board of Directors of Olde Salem Homeowners' Ass'n v. Secretary of Veterans Affairs*, 226 Ill. App. 3d 281, 284-85, 589 N.E.2d 761, 763 (1992). Although the court may draw inferences from the undisputed facts, where reasonable persons could draw divergent inferences from the undisputed facts, the motion should be denied. See *Pyne v. Witmer*, 129 Ill. 2d 351, 358, 543 N.E.2d 1304, 1308 (1989). The standard of review is *de novo. Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 669 N.E.2d 608 (1996). Thus, we may affirm a grant of summary judgment on any basis appearing in the record, regardless of whether the lower courts relied upon that ground. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261, 807 N.E.2d 439, 447 (2004).

■ Indeed, the construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law that we review *de novo* and thus are appropriate for disposition by summary judgment. *Traveler's Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292, 757 N.E.2d 481, 491 (2001); *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391, 620 N.E.2d 1073, 1077 (1993). The primary objective in construing the policy language is to ascertain and give effect to the intent of the parties to the contract. *Traveler's Insurance Co.*, 197 Ill. 2d at 292, 757 N.E.2d at 491. To determine the meaning of the policy language and the parties' intent, the policy must be construed as a whole, taking into account the type of insurance purchased, the subject matter, the risks undertaken and purchased, and the overall purpose of the contract. *Traveler's Insurance Co.*, 197 Ill. 2d at 292, 757 N.E.2d at 491; *Crum & Forster Managers Corp.*, 156 Ill. 2d at 391, 620 N.E.2d at 1078.

■ In this case, with respect to the painting, the Redland policy was a "valued policy." A valued policy does not estimate the value of the property insured, but is equivalent to an assessment of damages in the event of a loss. *Rockhold v. Canton Masonic Mutual Benevolent Society*, 129 Ill. 440, 460, 21 N.E. 794, 796 (1889). Under such a policy,

the parties intend "to substitute their present assessment for the result of later controversy. In the absence of fraud this is as conclusive as in the case of any other damages; and indeed valued insurance is only an instance of stipulated damages." *St. Paul Fire & Marine Ins. Co. v. Pure Oil Co.*, 63 F.2d 771, 772 (2d Cir. 1933).

Also, the trial court correctly concluded that the Redland policy was excess insurance by coincidence with the Zurich policy. See *Home Indemnity Co. v. General Accident Insurance Co.*, 213 Ill. App. 3d 319, 322-23, 572 N.E.2d 962, 964 (1991). The Redland policy clearly states that, "[i]f at the time of loss or damage there is available any other insurance which would apply to the property in the absence of this policy, the insurance under this policy will apply only as excess insurance over the other insurance." Conversely, the Zurich policy expressly permits the insured to maintain excess insurance. Although the gallery was the "insured" under the Zurich policy, there is no other language therein that precludes the Redland policy from serving as excess insurance. Thus, the protections under the Redland policy would not begin until those of the Zurich policy ended. See *Home Indemnity Co.*, 213 Ill. App. 3d at 321, 572 N.E.2d at 963.

■ Accordingly, the Redland policy would not be triggered until the Zurich policy was exhausted. Yet, assuming *arguendo* that the Zurich policy was exhausted by the over $2 million settlement paid to the estate (as summary judgment would be proper if the Zurich policy was not exhausted), the estate received more than the agreed value of the painting. Had the Redland policy not been a valued policy with respect to this painting, excess coverage may have been triggered, with Redland potentially liable to pay up to the limits of coverage or the market value of the painting. However, as the Redland policy was a valued policy with respect to this painting, the parties stipulated to the amount to which the estate would be entitled as damages in the event of a total loss. As the estate received more than those damages, no recoverable damages could be shown under the Redland policy.

The trial court rejected this argument, writing that "[t]he insurable value is fixed at $858,500 with respect to the Redland Policy, *not* with respect to all other insurance that may be taken out on the property." (Emphasis in original.) This is incorrect. Although such policies are referred to as "valued," the amount fixed is not considered an "insurable value" as such. Rather, it is a stipulation of damages designed to avoid disputes over the "value" of an item. Moreover, at this juncture, it is the Redland policy under which Zurich is attempting to collect, *not* other insurance. Indeed, the trial court's own words reveal the flaw in its rationale on this point: if "[t]he insurable value is fixed at $858,500 with respect to the Redland Policy, *not* with respect

to all other insurance that may be taken out on the property" (emphasis in original), Redland cannot be obliged to pay based on the fact that the painting's market value exceeded the agreed value stated in the Zurich policy without totally thwarting the intent of the parties to the Redland policy.

Furthermore, this court cannot ignore that, as a result of the settlement, Zurich is the party that would seek to recover from Redland, based on an assignment and settlement agreement with the estate. Subrogation is a method whereby one who has involuntarily paid a debt or claim of another succeeds to the rights of the other with respect to the claim or debt so paid. *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 319, 597 N.E.2d 622, 624 (1992). Yet in this case, such recovery would not inure to the estate, which was the insured under the Redland policy. Instead, any sum recovered would reduce the amount paid by Zurich. That result looks nothing like a payment under an excess insurance coverage. The doctrine of subrogation is a creature of chancery. *LaFramboise*, 149 Ill. 2d at 319, 597 N.E.2d at 624. Zurich has not explained how equity favors a result where the primary insurer pays less than the agreed value stated in its policy by forcing payment from an excess insurer with a lower agreed value. Rather, Zurich's desired relief looks more like a claim for equitable contribution from Redland—a claim it could not pursue because the carriers did not insure the same risks. See *Schal Bovis, Inc. v. Casualty Insurance Co.*, 315 Ill. App. 3d 353, 363, 732 N.E.2d 1179, 1187 (2000).

The trial court also suggested that the interaction of the excess insurance clause with the agreed-value portions of the Redland policy may create an ambiguity to be construed against the drafter, *i.e.*, Redland, and in favor of the insured. However, this rule is not dominant in a suit where the adversaries are two insurance companies. See *Alberto-Culver Co. v. Aon Corp.*, 351 Ill. App. 3d 123, 132-33, 812 N.E.2d 369, 378 (2004). Again, in this case, Zurich is not seeking a net increase in the payment to the insured, but to reduce the amount it is required to pay.

Nor was the Redland policy coverage illusory. The Redland policy was primary in the absence of other insurance. As excess insurance, Redland would have been required to pay the difference had the Zurich policy been written for less than $858,000. The fact that another party obtained insurance with a higher agreed value means that the Redland policy was not triggered in this case, but that is not illusory coverage.

In sum, the trial court did not err in granting summary judgment in favor of Redland, albeit for reasons other than those stated by the

circuit court. Given this conclusion, this court need not address Zurich's other contentions on appeal.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'BRIEN and GALLAGHER, JJ., concur.