NO. 4-04-1034

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

K'S MERCHANDISE MART, INC., an ) Appeal from

Illinois Corporation, ) Circuit Court of

Plaintiff-Appellee and ) Macon County

Cross-Appellant, ) No. 01CH287

v. )

NORTHGATE LIMITED PARTNERSHIP, an ) 

Illinois Limited Partnership, ) Honorable

Defendant-Appellant and ) Thomas E. Little,

Cross-Appellee. ) Judge Presiding.

_________________________________________________________________

PRESIDING JUSTICE COOK delivered the opinion of the

court:

In connection with the sale of a shopping center, the anchor tenant executed an estoppel certificate certifying that the landlord had performed all its obligations and was not in default.  A question later arose whether the tenant's obligation to pay maintenance expenses included an obligation to pay a management fee based on a percentage of the shopping center's gross revenue from all tenants.  The trial court held that the tenant had no obligation to pay the management fee.  We affirm.

I. BACKGROUND 

This case involves the lease of department store premises in the Northgate Shopping Center (Center) in Decatur, Illinois.  The original lease was executed December 4, 1970, between a trust, as lessor, and Jewel Companies, Inc., as lessee.  The parties have changed several times over the years.  The trust was succeeded as lessor by Decatur Investors, LLC, which was itself succeeded on January 27, 2000, by Northgate Limited Partnership (Northgate), the current lessor.  Jewel Companies, Inc., the lessee, subleased the property to May Department Stores Company, which later assigned the lease to Venture Stores, Inc. (Venture).

Decatur Investors and Venture attempted to negotiate a lease to replace the underlying lease and sublease but were unsuccessful.  Instead, the parties entered into an additional agreement on July 7, 1997.  The basic thrust of the 1997 agreement was to require the lessor to make certain improvements, following which the lessee would make additional payments.  Venture went into bankruptcy, however, and on August 31, 1998, K's Merchandise Mart, Inc. (K's), was the successful bidder at a bankruptcy sale of Venture's interest in the lease.  Apparently the lease had some advantages that made it desirable to a new lessee as opposed to executing a new lease with the lessor.

The required improvements were substantially completed by October 27, 1998, after K's had acquired the property.  Section 2(b) of the 1997 agreement provided:

"[U]pon substantial completion of the 

remodeling and improvements described *** 

and notwithstanding anything to the contrary 

which may be contained in the [s]ublease:

***

(B) Venture shall pay to [o]wner 

(Decatur Investors) its full pro[-]rata share 

of:

(i) all expenses for the operation, 

maintenance, repair, replacement, policing 

and protecting and lighting of the ex-

terior common areas of the entire 

[s]hopping [c]enter ***;

(ii) all expenses for painting, 

cleaning[,] and routine maintenance *** 

of the exterior of the building of the 

[s]hopping [c]enter; and

(iii) all expenses for insuring the 

entire [s]hopping [c]enter ***. 

Under the sublease, common-area-maintenance expenses had been included in the minimum rent.  

A. Events Preceding the Estoppel Certificate

After October 27, 1998, Decatur Investors began to bill K's $3,604.22 per month, the estimated amount representing K's share of the common-area-maintenance expenses.  The estimated amount included a management fee equal to 5% of the shopping center's gross revenue from all tenants, but no management fee was mentioned in the billing.  Nor did Decatur Investors identify how the common-area-maintenance expenses were estimated.  The first time that a management fee was mentioned was in October 1999, when Decatur Investors sent K's a reconciliation statement for the year 1998 common-area-maintenance expenses.  The statement indicated the total common-area-maintenance expenses for all tenants for 1998 was $91,755.91, including a line item for $22,928.54 in management fees, but did not indicate how those management fees were calculated.  K's 
pro
-
rata
 share, for the 66 days it had been the lessee, was calculated at $8,090.01.  K's was credited for $7,789.77 in estimated monthly payments, leaving a $300.24 deficit, for which K's sent Decatur Investors a check.

On January 27, 2000, Northgate purchased the shopping center from Decatur Investors.  As a part of that purchase, on January 21, 2000, in compliance with the lease documents, Richard Powers, K's vice-president and chief financial officer, executed an estoppel certificate prepared by Northgate and/or the lender.  The estoppel certificate read in part as follows:

"This Certificate is given to First Union 

National Bank, *** ('Lender'), and [Northgate]

('Purchaser') by [K's] ('Tenant'), with the 

understanding that Lender and Purchaser and 

their counsel will rely on this certificate 

in connection with a proposed mortgage loan 

(the 'Loan') and purchase on the *** North-

gate Shopping Center *** (the 'Property').

Tenant hereby certifies as follows:

1. *** A true, correct[,] and com-

plete copy of the [l]ease, together 

with any amendments, modifications[,] 

and supplements thereto, is attached 

hereto.  The lease is the entire agree-

ment between the undersigned, said 

sublessor, and the [o]wner of the 

Shopping Center, pertaining to the 

leased premises. ***

2.  Tenant's Lease terms: *** 

Tenant's percentage share of operating 

expenses/common area charges and insur-

ance is 48.89% ***, which is currently 

being paid on an estimated basis in ad-

vance at the rate of $3,604.22 per month 

for common[-]area charges ***.

* * *

6.  All obligations of Landlord 

under the [l]ease have been performed, 

and Landlord is not in default under 

the [l]ease.  There are no offsets or 

defenses that Tenant has against the full 

enforcement of the [l]ease by landlord.  

No free periods of rent, tenant improve-

ments, contributions or other concessions 

have been granted to Tenant; Landlord is 

not reimbursing Tenant or paying 

Tenant's rent obligations under any other 

lease; and Tenant has not advanced any 

funds for or on behalf of Landlord for 

which Tenant has a right of deduction 

from, or setoff against, future rent 

payments.

* * *

9. *** The person executing this 

estoppel certificate is authorized by 

Tenant to do so and execution hereof 

is the binding act of Tenant enforceable 

against Tenant."

B. Events After the Estoppel Certificate

In March 2000, shortly after executing the estoppel certificate, K's received the reconciliation for the year 1999, a time prior to the sale of the center to Northgate.  The total common-area-maintenance expenses for all tenants was listed at $141,600.45, including $45,734.29 in management fees.  K's 
pro
- 
rata
 share was calculated to be $69,044.38, and K's was given a credit for $45,793.74 in estimated monthly payments, leaving a deficit of $25,793.74.  Although K's noted an increase in the monthly common-area-maintenance expenses from $3,604.22 to $5,985.71, no extensive review of the lease was performed by K's and K's sent a check for the reconciled figure to Northgate.  

In March 2001, Northgate sent K's the reconciliation for the year 2000.  The total common-area-maintenance expenses for all tenants was listed at $146,942.51, including $63,675.71 in management fees.  K's 
pro
-
rata
 share was calculated to be $71,828.49 and K's was given a credit for $43,250.64 in estimated monthly payments, leaving a deficit of $28,577.85.  The statement required K's to begin to pay $5,985.71 per month in estimated monthly payments beginning April 1, 2001, in place of the previous $3,604.22.  After resolving some discrepancies, K's sent a check to Northgate for the reconciled figure of $27,671.95.  In July 2001, K's sent a letter to Northgate objecting to the inclusion of the management fee as a part of the common-area-maintenance expenses.  In October 2001, K's filed this declaratory judgment action.  

Fine Associates was the agent of Decatur Investors.  Fine Associates sent K's the estimated monthly billings, which did not mention a management fee.  Fine Associates sent K's the reconciliation statement in October 1999, which mentioned 
that management fees were being charged as a part of common-area-maintenance expenses, but did not explain how the fees were calculated.  At approximately that same time, Fine Associates began negotiating a sale of the Center to Northgate.  During its investigation of the purchase, Northgate was assured by Fine Associates that K's was paying, as a part of its common-area-maintenance expenses, 5% of gross rents as a management fee.  Moreover, Northgate received a prospectus from a New York broker containing the representation that K's, as well as the other tenants in the Center, were paying all management fees and common-area-maintenance operating expenses.  The leases of all the other tenants contained an express provision for the payment of management fees.  Fine Associates also sent K's the year 1999 reconciliation statement in March 2000, after the estoppel certificate had been signed.  Northgate agreed in the purchase of the Center to assume the risk for any misrepresentation and that its purchase of the premises was based on its own investigation and inquiry. 

C. The Trial Court's Order

On December 7, 2004, the trial court entered a seven-page written order, carefully setting out its findings of fact and conclusions of law.  The court found there was no obligation under the terms of the lease documents for K's to pay Northgate a management fee.  Although K's was required to pay its 
pro
-
rata
 share of operating expenses, the court concluded "that a management fee is not an expense involved in the direct operation of the shopping center."  The language of the 1997 agreement did not include a management fee, "and this court simply cannot rewrite the 1997 agreement to insert such an important term."  Further, the execution of the estoppel certificate did not modify the terms of the lease.  "While the accuracy of an estoppel certificate is vitally important to the lender in assessing the buyer's ability to service the debt on the loan, these documents are primarily for the benefit of the lending institution and are not intended to modify the terms of a lease."       

II. ANALYSIS

The interpretation of a contract is a question of law to be reviewed 
de
 
novo
 on appeal.  
Gray v. Mundelein College
, 296 Ill. App. 3d 795, 803, 695 N.E.2d 1379, 1385 (1998).  Where extrinsic evidence is needed to establish the intent of the parties, that intent is a question of fact and will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence.  
Gray
, 296 Ill. App. 3d at 803, 695 N.E.2d at 1385.    

The primary objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract.  
Rybicki v. Anesthesia & Analgesia Associates, Ltd.
, 246 Ill. App. 3d 290, 298, 615 N.E.2d 1236, 1242 (1993).  The language used in the contract generally is the best indication of the parties' intent.  
In re Marriage of Dundas
, 355 Ill. App. 3d 423, 426, 823 N.E.2d 239, 241 (2005).  However, "[a] word is not a crystal, transparent and unchanged[;] it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."  
Towne v. Eisner
, 245 U.S. 418, 425, 62 L. Ed. 372, 376, 38 S. Ct. 158, 159 (1918) (opinion by Justice Holmes).  The contract must be construed as a whole, taking into account the overall purpose of the contract, and the context in which the language is used.  
Redland Insurance Co. v. Lerner
, 356 Ill. App. 3d 94, 98, 824 N.E.2d 1096, 1100 (2005); 
Sklodowski v. Countrywide Home Loans, Inc.
, 358 Ill. App. 3d 696, 700, 832 N.E.2d 189, 193 (2005).  

In Illinois, a written contract is presumed to include all material terms agreed upon by the parties, and any prior negotiations or representations are merged into that agreement; extrinsic evidence, parol or otherwise, of antecedent understandings and negotiations is generally inadmissible to alter, vary, or contradict the written instrument.  
Prentice v. UDC Advisory Services, Inc.
, 271 Ill. App. 3d 505, 514, 648 N.E.2d 146, 152 (1995) (parol evidence rule). 

A. Did the Lease Include Management Fees?

The trial court found that no language in the lease documents requires the lessee to pay a management fee.  Language in the 1997 agreement requires the lessee to pay a 
pro
-
rata
 share of "all expenses for the operation, maintenance *** of the exterior common areas," but that language seems to refer to direct out-of-pocket expenses, not uncertain management costs.  Management fees are generally additional charges or indirect fees to either cover the landlord's indirect overhead or to add directly to the landlord's profits, similar to a rent increase.  Out-of-pocket expenses are fixed, but management fees are not, and can be set in any amount.  It is true that hiring snow removal or parking-lot repair requires some supervision, but when a lessor pays itself for its time in managing service workers, uncertainty is added to the concept of maintenance expenses.  As the trial court found, the 1997 agreement should not be rewritten to insert such an important term.  

We agree the lease documents did not obligate K's to pay a management fee.  

B. The Estoppel Certificate 

An estoppel certificate is "[a] signed statement by a party (such as a tenant or mortgagee) certifying for another's benefit that certain facts are correct, as that a lease exists, that there are no defaults, and that rent is paid to a certain date.  A party's delivery of this statement estops that party from later claiming a different state of facts."  Black's Law Dictionary 572 (7
th ed. 1999).  "The purpose of an estoppel statement is twofold:  (1) to give a prospective purchaser or 

lender information about the lease and the leased premises and (2) give assurance to the purchaser or lender that the lessee at a later date will not make claims that are inconsistent with the statements contained in the estoppel."  A. Arnold & J. O'Neill, 1 Real Estate Leasing Practice Manual §35:1 (West Online 2005).  Estoppel certificates are important and useful devices to preserve and enhance the marketability of commercial property.  They are widely used in commercial real estate transactions.

The best way to interpret a contract is to give it the meaning the parties have given it.  In cases involving the sale of goods, course of dealing, usage of trade, and course of performance may be considered to explain or supplement the terms of an agreement even without a determination that the agreement is ambiguous.  810 ILCS Ann. 5/2-202, Uniform Commercial Code Comment (1)(a), at 95 (Smith-Hurd 1993); 
cf
. 
Air Safety, Inc. v. Teachers Realty Corp.
, 185 Ill. 2d 457, 465, 706 N.E.2d 882, 885-86 (1999) (applying the "four corners" rule where contract includes an integration clause); see also R. Posner, 
The
 
Law
 
and
 
Economics
 
of
 
Contract
 
Interpretation
, U. Chi. Law & Econ., Olin Working Paper No. 229 V.(A.) (November 2004) (endorsing admission of objective evidence of the parties' behavior, limited by the parol evidence rule).
  By their very nature, estoppel certificates look to the course of performance.  In an estoppel certificate, the signer is certifying the course of performance has not produced any defaults.

A party who executes an estoppel certificate should not be allowed to raise claims of which it knew or should have known at the time the certificate was executed.  A party who executes an estoppel certificate that there are no defaults is under a duty to inquire and determine, insofar as reasonably possible, what claims exist.  On the other hand, an adverse party may not use an estoppel certificate as a device to make undisclosed changes to the lease.  Those who prepare estoppel certificates should be encouraged to make specific reference to known items of dispute, not rely on all-encompassing language of waiver.  

Northgate asserts the estoppel certificate precludes K's from challenging the management fee for two reasons.  First, K's agreed that it was paying $3,604.22 per month for common-area charges.  That $3,604.22 per month, according to the reconciliation statement sent to K's in October 1999, included a line item for management expenses.  Second, the estoppel certificate stated "Landlord is not in default under the [l]ease."

Should K's have known of its obligation to pay management fees when it signed the estoppel certificate?  There was no reference to a management fee in K's lease documents, although the leases of the other tenants contained such a reference.  Nor was there a history of performance here.  The prior tenant, Venture, never paid any management fees, or for that matter, any common-area-maintenance expenses.  The monthly billings set out the amount of $3,604.22, but they did not mention any management fee.  The year 1998 reconciliation, received in October 1999, did contain a line item for a management fee, but it did not explain that the management fee was computed as 5% of the Center's gross revenue from all tenants.  K's share of the year 1998 reconciliation was only for 66 days, K's was only required to make a payment of $300.24, and the reconciliation occurred only a few months before K's was required to sign the estoppel certificate.  The trial court attached no significance to the fact that K's "did not conduct an extensive analysis of the [common-area-maintenance] expenses at this time and the court finds [its] actions to be reasonable under the then-existing circumstances."  We agree the events prior to the execution of the estoppel certificate did not rise to the level that K's should reasonably have known of the management fee.  Events subsequent to the execution of the certificate cannot be used to show K's knowledge when the certificate was signed.

Could K's have been required to continue paying the $3,604.22 per month?  K's certified that it was obligated to pay that amount, even though it may not have known what was contained in it, in particular a management fee of perhaps $900.  Northgate, however, is not asking for that.  Northgate is asking for a management fee with no upper limit, a management fee that most recently was at the level of about $2,600.  Even if the estoppel certificate obligated K's to pay the items totaling $3,604.22, we are unwilling to read the estoppel certificate to require payment of an undisclosed management fee greatly in excess of the $900 contained in the estimated monthly billings.

It is difficult to be critical of either party in this case.  Northgate apparently believed that K's had an obligation to pay management fees.  In forming that belief, however, Northgate did not rely on what appeared in the lease documents or the estoppel certificate.  Northgate instead relied on what it was told by Fine Associates and the broker in the prospectus.  The question here is not the good faith or reliance of Northgate. The estoppel certificate covers only (1) facts which are specifically set out, or (2) the course of performance under the lease, if the estoppel certificate states there are no defaults.  In this case, the estoppel certificate did not address management fees and no course of performance sufficed to charge K's with knowledge of the management fee.    

In the unusual circumstances of this case, the trial court properly found the estoppel certificate did not bind K's to pay a 5% management fee.      

C. The Cross-Appeal

K's points out that the 1997 agreement between Decatur Investors and Venture, after requiring Venture to pay its full 
pro
-
rata
 share of the common-area-maintenance expenses, stated "less all sums paid therefor pursuant to the [s]ublease."  Of course, under the sublease, maintenance expenses were included in the minimum rent payment.  K's makes alternative arguments as to the meaning of this language:  (1) that the parties intended 1997 to be a base year, with the tenant to pay only common-area-maintenance expenses over and above the amount paid in the base year, or (2) that K's is entitled to a credit for the maintenance expenses included in the minimum rent and K's should pay no common-area-maintenance expenses unless those expenses exceed the monthly rent payment.  The trial court entered summary judgment against K's on both those counts.  

K's argument is contrary to the plain language of the 1997 agreement.  The essence of that agreement was that the owner would make substantial improvements to the Center and the tenant would begin paying common-area-maintenance expenses.  The 1997 agreement makes it clear that it was changing the sublease, using the language "notwithstanding anything to the contrary which may be contained in the sublease," followed by the language requiring payment of the common-area-maintenance expenses.  

What 
does
 the language "less all sums paid therefor pursuant to the sublease" mean?  There were special provisions under the sublease.  For example, section 4.2 of the sublease contains a self-help provision, which allows the tenant to perform "alterations, repairs, maintenance or restorations which the [o]wner is obligated to make" if the owner fails to do so, and receive a credit for those costs.  It appears the language applies to those special provisions and does not negate the basic provision of the 1997 agreement that the tenant will pay common-area-maintenance expenses.

III. CONCLUSION

For the reasons stated, we affirm the trial court's grant of declaratory judgment in favor of K's.  We affirm the grant of summary judgment to Northgate.

Affirmed.               

APPLETON and McCULLOUGH, JJ., concur.