DECISION
Before the Court are Super. R. Civ. P. 56 cross motions for summary judgment filed by Inland American Retail Management, LLC (Inland or Plaintiff) and Cinemaworld of Florida, Inc. (Cinemaworld or Defendant). This matter arises out of a dispute over the terms of a twenty-year Ground Lease (Lease) between the parties. Plaintiff moved for summary judgment on its one-count Complaint for breach of contract, seeking the total amount of rent in arrears, plus interest, costs, and attorneys' fees. Plaintiff also seeks summary judgment on all counts of Defendant's Amended Counterclaim which seeks (1) a judgment declaring that all sums due under the Lease have been paid; (2) a judgment declaring that there presently exists no default under the Lease; (3) an order for an accounting of all calculations used by Plaintiff with respect to the Lease and Defendant's obligations thereunder; (4) an injunction prohibiting Plaintiff from proceeding with an eviction action; and (5) a judgment for all damages sustained as a result of Plaintiff's alleged negligence in installing and maintaining adequate surge protection. Defendant objects to Plaintiff's request for summary judgment and has moved for partial summary judgment on Count II of its Amended Counterclaim, seeking an accounting. *Page 2 
 I Facts and Travel[1]
On December 16, 2003, Inland's predecessor-in-interest, LB Lincoln Mall Holdings, LLC (LB), entered into a Lease with Cinemaworld's predecessor-in-interest, Cinema World, Inc., of certain Premises located at the Lincoln Mall Shopping Center (Shopping Center) for the purposes of operating a movie theater.[2] According to the Lease, the Premises included the Land, the Building, and the Improvements.[3]
Under the Lease, Cinemaworld agreed to accept the Premises "as is" and acknowledged "that it ha[d] inspected the Premises and the Building and . . . found [them] to be satisfactory." (Lease § 2.04.) In addition, Cinemaworld was required to "perform the necessary work to construct upon the Land, a theater Building, [to] be constructed in conformity with the terms and conditions set forth" in the Lease. Id. § 6.01. The Lease specified that the Building was to "contain approximately 60,000 gross square feet of floor area[,]" and "built so as to be fully located within the area shown cross-hatched on Exhibit B." Id.
In connection therewith, Cinemaworld acknowledged that it bore the sole cost and expense of "construct[ing] on the Land such site work, utilities, sewer, curbing, walkways, parking area, lighting, drives and landscaping . . ." as well as "providing to the Premises all utility lines required for the operation of the Premises and the Improvements thereon." Id. The *Page 3 
Lease specified that Cinemaworld was required to pay "all costs, charges, deposits and assessments related" to Utilities attributable to the Premises; and Landlord had no liability to any party "for any inadequacy, cessation, or interruption of any Utilities."Id. § 10.01.
Beginning in 2005, Cinemaworld constructed the necessary Improvements and site work; and the theater opened in November of 2005. The Building contained approximately 60,000 square feet and consisted of sixteen individual movie theaters, concession stands for the sale of food and novelties, and space for coin operated game machines. Cinemaworld spent in excess of $10.5 million, of which $9.9 million was financed through a mortgage.
In addition to its construction and utility obligations, the Lease required Cinemaworld to make monthly Rental payments.Id. § 3.01. These Rental payments included not only the Minimum Rent, but also an Additional Rent which consisted of "[a]ll other sums [that] bec[a]me due and payable by Tenant to Landlord under th[e] Lease." Id.
As part of the Additional Rent, Cinemaworld was also responsible for monthly payments equal to one-twelfth of Tenant's Proportionate Share of the Common Area Maintenance Costs.[4]Id. § 8.04. Tenant's Proportionate Share was calculated by multiplying Landlord's estimate of the monthly Common Area Maintenance Costs by a fraction, the "numerator of which is the *Page 4 
leasable floor area of the Building and the denominator of which is the leasable floor area of all buildings on the Shopping Center as of the first day of the applicable calendar year to which Common Area Maintenance Costs relate." Id. In the instance that the estimated monthly amounts paid by Cinemaworld were greater or less than the actual Common Area Maintenance Costs, within 180 days after the expiration of the calendar year, an adjustment was made to reflect the difference. Id. § 8.05.
The Lease also required that Cinemaworld pay as Additional Rent, "all taxes, duties, assessments and charges commonly and generally referred to as `real estate taxes' and assessments . . . imposed upon the Land or any part thereof, the Building(s) and Improvements."[5] Id. § 9.01. The Lease distinguished the manner of payment depending on whether or not the Premises was assessed as a separate tax parcel or as part of the Shopping Center.Id. § 9.02. If the Premises was assessed as a separate tax parcel, then the Tenant was responsible for directly paying all Taxes to the applicable taxing authority. Id. However, if the Premises was not separately assessed, Tenant was required to pay as Additional Rent, "such amount as Landlord shall reasonable estimate to equal one-twelfth (1/12) of the Taxes for the current calendar and/or fiscal year." Id. In such instances, Tenant was required to pay Landlord its "reasonable share" of the Taxes or Charges (which included taxes, assessments, levies, fees, and other governmental charge of every kind or nature) "as reasonably determined by Landlord in consultation with Tenant."Id. § 25.01. As with Common Area Maintenance Costs, following the receipt of all tax and assessment bills for the year in question, an adjustment was made to reflect any excess or deficiency resulting from the difference between the estimated and actual amount billed. Id. § 9.02. *Page 5 
In May 2006, MB Lincoln Mall, LLC (MB) purchased the Shopping Center from LB and Inland became its managing agent. Prior to the closing, LB and Cinemaworld executed a release agreement (Release Agreement) concerning a dispute over the completion of and payment for additional site-work resulting from the parties' agreement to relocate the Premises to a different site pad. See Pl.'s Summ. J. Mem. Ex. K. The Release Agreement provided that in consideration for LB's payment of $240,000 to Cinemaworld's contractors, Cinemaworld agreed to "release, remise, hold harmless and forever discharge all claims" against LB arising out of or connected with the disputed additional work. Id.
In connection with the Release Agreement and closing, Cinemaworld provided a tenant estoppel certificate (Estoppel Certificate) certifying to Inland that LB was not in default under the Lease and that "Rent ha[d] been paid through May 31, 2006." Id. The Estoppel Certificate further stated that the "certification [was] made with the knowledge that Purchaser [was] about to acquire title to the Property and obtain financing." Id.
On July 30, 2007 and January 11, 2008, Cinemaworld experienced power surges that resulted in a total loss of power. As a result, Cinemaworld was unable to conduct business during the outage, and alleges that it incurred $63,087.15 in lost revenue during those two days of operations.
On July 7, 2008, Inland notified Cinemaworld that it was in default of its obligations under the Lease in light of its failure to pay the full amount of Taxes due to date, and made an immediate demand for the past due Additional Rent. See Pl.'s Summ. J. Mem. Ex. I. Inland alleges that it was owed an additional $280,538.27 for unpaid Taxes for the years 2006-2008. Additionally, on January 9, 2009, Cinemaworld received an invoice and notice of default form from Inland. In the notice of default, Inland demanded $343,063.31, which included the unpaid *Page 6 
real estate taxes, unpaid electric, unpaid base rent, and "Catch Up Billing" to date.[6] See Pl.'s Summ. J. Mem. Ex. F. Inland further threatened eviction if the demanded sum was not paid.
 II Standard of Review
Summary judgment is proper when, after reviewing the admissible evidence in a light most favorable to the non-moving party, "no genuine issue of material fact is evident from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and the motion justice finds that the moving party is entitled to prevail as a matter of law."Smiler v. Napolitano, 911 A.2d 1035, 1038 (R.I. 2006) (quoting Rule 56(c)). When considering a motion for summary judgment, "the court may not pass on the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion."Westinghouse Broad. Co., Inc. v. Dial Media, Inc.,122 R.I. 571, 579, 410 A.2d 986, 990 (R.I. 1980) (internal citations omitted). During a summary judgment proceeding, "the justice's only function is to determine whether there are any issues involving material facts." Steinberg v. State,427 A.2d 338, 340 (R.I. 1981). Moreover, in passing upon a motion for summary judgment under Rule 56, if no genuine issue of material fact exists, the trial justice may determine "`whether the moving party is entitled to judgment under the applicable law.'"Ludwig v. Kowal, 419 A.2d 297, 301 (R.I. 1980) (quotingBelanger v. Silva,114 R.I. 266, 267, 331 A.2d 403, 404 (1975)). "When there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment *Page 7 
is properly entered." Tangleridge Dev. Corp. v. Joslin,570 A.2d 1109, 1111 (R.I. 1990); see also Holliston Mills,Inc. v. Citizens Trust Co., 604 A.2d 331, 334 (R.I. 1992) (stating that "summary judgment is proper when there is no ambiguity as a matter of law").
 III Discussion A Taxes 1 Cinemaworld's Reasonable Share of the Taxes
The instant action focuses on the parties' responsibilities under the Lease. Inland asserts that Cinemaworld has breached the Lease and owes Additional Rent, specifically its reasonable share of real estate taxes. Conversely, Cinemaworld contends that Inland has applied a standard for the allocation of Taxes that is inconsistent with the plain language of the Lease.
Contract interpretation is generally a question of law; it is only when contract terms are ambiguous that construction of terms becomes a question of fact. Clark-Fitzpatrick, Inc., v. Gill,652 A.2d 440, 443 (R.I. 1994). Thus, "the construction of a clear and unambiguous contract presents an issue of law which may be resolved by summary judgment." Lennon v. MacGregor,423 A.2d 820, 822 (R.I. 1980). Simply stated, a court must apply the terms of a clear and unambiguous contract as written. A.F. LusiConstr., Inc. v. Peerless Ins. Co., 847 A.2d 254, 258 (R.I. 2004) (citing W.P. Assocs. v. Forcier, Inc.,637 A.2d 353, 356 (R.I. 1994)).
In determining whether an agreement is clear and unambiguous, the document must be viewed in its entirety and its language given its plain, ordinary, and usual meaning. Antone v. Vickers,610 A.2d 120, 123 (R.I. 1992). Therefore, an agreement is ambiguous only when it is *Page 8 
reasonably and clearly susceptible to more than one interpretation.W.P. Assocs., 637 A.2d at 356 (citing Gustafson v. Max FishPlumbing Heating Co., 622 A.2d 450, 452 (R.I. 1993);see also Federal Deposit Ins. Corp. v. Singh,977 F.2d 18, 22 (1st Cir. 1992) (stating that "[a] contract is not ambiguous simply because litigants disagree about its proper interpretation"). When ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected. Andrukiewicz v.Andrukiewicz, 860 A.2d 235, 239 (R.I. 2004); see alsoSystematized of New England, Inc. v. SCM, Inc.,732 F.2d 1030, 1034 (1st Cir. 1984) (noting that when ambiguous contracts arise, a court should favor interpretations which give meaning and effect to every part of the contract and reject those which reduce words to mere surplusage).
Here, the Court finds that the language of the Lease is both clear and unambiguous, and therefore, a construction of the Lease is ripe for resolution as a matter of law. The Lease stated that Rental consisted of both "Minimum Rent" and "Additional Rent." (Lease § 3.01.) As part of Additional Rent, the Tenant was required to pay "all taxes, duties, assessments and charges commonly and generally referred to as `real estate taxes' and assessments [on the] Land or any part thereof, the Building(s) and Improvements. . . ." Id. § 9.01. The Lease further provided that:
 "Tenant shall be responsible for, and shall pay, prior to delinquency, any and all taxes, assessments, levies, fees and other governmental charges of every kind or nature (collectively, `Charges') levied or assessed by a municipal, county, state, federal or other taxing or assessing authority upon, against or with respect to:
 "(i) The Premises or any leasehold interest therein, or any use thereof, including, without limitation, any use and/or occupancy tax; *Page 9 
 "(ii) All fixtures, furnishings, equipment, merchandise and personal property of any kind owned by Tenant and placed, installed or located in, within, upon or about the Premises, and
 "(iii) All or any portion of the Rentals payable by Tenant to Landlord; irrespective of whether any of such items described in clauses (i) through (i) [sic] above are assessed as real or personal property, and irrespective of whether any such items are assessed to or against Landlord or Tenant." Id. § 25.01.
Therefore, under the plain language of the Lease, Cinemaworld's liability for Taxes and Charges is limited to the Premises, which includes only the Land, the Building, and the Improvements as defined by the Lease.[7] In fact, nothing in the Lease requires Cinemaworld to pay Taxes or Charges on any parking or common areas, and the Taxes attributable to those areas should be deleted prior to calculation.
The Lease further provides that the manner of payment of the Taxes is contingent upon whether the Premises — defined as "[t]he Land, the Building and the Improvements" — are assessed as a separate tax parcel. Id. § 9.02. Where, as here, Cinemaworld is not separately assessed, it is required to make monthly escrow payments in the amount of one-twelfth of Landlord's reasonable estimate of the Taxes for the year. Id. Further, following the receipt of all tax and assessment bills, Tenant is required to pay or be credited for the difference between the amount of actual Taxes due for the year and the total estimated amount paid. Id.
Similarly, when Charges — which includes more than just real estate taxes — are not levied and assessed separately and directly to Cinemaworld, the Lease required that Cinemaworld "pay to the Landlord Tenant's reasonable share thereof as reasonably determined by Landlord in consultation with Tenant."Id. § 25.01. Hence, it is manifestly clear to the Court that unlike *Page 10 
Common Area Maintenance Costs, the Lease does not contain an explicit formula by which to calculate Cinemaworld's "reasonable share" of the Taxes and Charges.[8]
Presently, neither party appears to dispute the basic formula by which to calculate Cinemaworld's "reasonable share" of the Taxes. While the parties differ as to appropriate deductions to be taken from the yearly tax bill and the appropriate square footage of the Shopping Center to be used in the calculation, it is not disputed that Cinemaworld's reasonable share should be computed by multiplying the tax bill by a fraction, the numerator of which is the square footage of the theater and denominator of which is the square footage of the Shopping Center.
As a matter of law, the Court has previously determined that the plain and unambiguous language of the Lease does not require Cinemaworld to pay Taxes attributable to parking and common areas. Now, upon further review, the Court also finds that the square footage of the Shopping Center to be used in calculating Cinemaworld's reasonable share of the Taxes is not limited to the square footage depicted in Exhibit A to the Lease. Cinemaworld has unquestionably overstated the binding effect of Exhibit A. The Lease clearly defined the Shopping Center as "Lincoln Mall Shopping Center, Lincoln, Rhode Island, the present boundaries of which are delineated on Exhibit A, which includes the Premises."Id. § 1.01 (emphasis added). A plain reading of the definition indicates that "Shopping Center" refers to Lincoln Mall Shopping Center, while Exhibit A is referenced for purely illustrative purposes. It *Page 11 
is abundantly clear to the Court that the use of the word "present" indicates that the boundaries and square footage illustrated in Exhibit A were not a limitation and were subject to change in the future. Any other reading would inappropriately result in surplusage. Andrukiewicz, 860 A.2d at 239.
The Court's reading is further bolstered by the following provision:
 "Exhibit A shall not be deemed a representation or warranty of the continuing layout or configuration of the Shopping Center (including the Common Area) and dimensions thereon are approximate and are not drawn to scale. . . . Landlord shall have the unrestricted right to construct from time to time additional improvements on the Shopping Center or increase, reduce, eliminate, relocate or change the size, dimensions, design, configuration or location of any or all Common Area (including without limitation, the parking areas), the buildings, or other improvements in the Shopping Center in any manner whatsoever, provided that the Landlord agrees that no such change shall materially and adversely impair visibility of or access to the Premises on a permanent basis." Id. § 8.01.
This provision explicitly contemplated that although Exhibit A illustrated the "present" boundaries of the Shopping Center, it in no way was a representation of or limitation on the Shopping Center's actual boundaries. Moreover, although this language is contained in the section related to Common Area Maintenance Cost, if the Court were to read this language as merely limited to the common area matters, numerous portions of this provision would also be improperly reduced to mere surplusage. Andrukiewicz,860 A.2d at 239.
Accordingly, in light of these determinations, the Court finds that Defendant's reasonable share of the Taxes should be calculated by: (1) taking the entire tax bill for the Shopping Center; (2) excluding the taxes attributable to the parking and common areas; (3) and multiplying the remaining tax bill by a fraction, the numerator of which is the square footage of the Building, *Page 12 
and the denominator of which is the current leasable square footage of the Shopping Center which is not separately assessed to other tenants.[9]
While the Court is willing at this juncture to declare as a matter of law the formula by which to calculate Defendant's reasonable share of the Taxes, the Court finds that it has insufficient information by which to conclude as a matter of law that Cinemaworld has breached the Lease, and therefore, denies summary judgment as to Count I of Plaintiff's Complaint. Indeed, the Court finds that questions of fact remain as to the current leasable square footage of the Shopping Center and the monetary value of taxes attributable to the parking and common areas that should be deducted from the corresponding tax bills. For that reason, the Court finds an accounting appropriate and necessary under the circumstances, and therefore, grants Defendant's motion for partial summary judgment as to Count II of its Amended Counterclaim. The Court orders a complete and full accounting of (1) the Taxes attributable to the parking and common areas to be deducted from the corresponding tax bills; (2) all sums received to date from or on behalf Cinemaworld; and (3) the total Taxes owed in light of the Court's foregoing determination as to the appropriate Taxes formula.[10] *Page 13 
 2 Estoppel Certificate
Defendant alleges that the Estoppel Certificate attached as Exhibit B to the Release Agreement relieves it of liability for any Taxes prior to May 31, 2006. Conversely, Inland contends that the Estoppel Certificate is not binding on the instant matter, and even if it were a binding waiver, it does not bar the collection of real estate taxes that were not yet known or assessed at the time.
The Court's review of the Release Agreement and Estoppel Certificate reveals that the terms are clear and unambiguous, and therefore, must be applied as written. A.F. Lusi,847 A.2d at 258 (citing W.P. Assocs., 637 A.2d at 356). In the Release Agreement, Cinemaworld agreed to "release, remise, hold harmless and forever discharge all claims" against LB arising out of or connected with the disputed work by one of Cinemaworld's contractors, in consideration of a payment by LB in the amount of $240,000. (Pl.'s Summ. J. Mem. Ex. K.) Therefore, its scope is expressly limited to claims arising out of the disputed work and has no effect on the matters at hand.
An "estoppel certificate" is a common device used in real estate transactions. Lakeview Management, Inc. v. Care Realty, LLC, No. 07-cv-303-SM, 2009 WL 903818, *19 (D.N.H. Mar. 30, 2009). It consists of a "`[a] signed statement by a party (such as a tenant or mortgagee) certifying for another's benefit that certain facts are correct. . . . A party's delivery of this statement estops that party from later claiming a different state of facts.'"Id. (quoting K's Merch. Mart,Inc. v. Northgate Ltd. P'ship,359 Ill. App. 3d 1137, 1443, 835 N.E.2d 965, 971 (Ill. App. Ct. 2005). Therefore, here, Cinemaworld's representation in the Estoppel Certificate that "Rent ha[d] been paid through May 31, 2006," serves only to estop Cinemaworld from later *Page 14 
claiming a different state of facts. Id.; see also Pl.'s Summ. J. Mem. Ex. K. The Estoppel Certificate was provided for Inland's benefit and may not now be used against it. SeeNorthgate, 359 Ill. App. 3d at 1443, 835 N.E.2d at 971 (noting that the purpose of an estoppel certificate is to (1) give a prospective purchaser information about the lease and the leased premises; and (2) give assurance to the purchaser that the tenant will not, at a later date, make claims that are inconsistent with the statements contained in the certificate).
In any case, however, it is clear to the Court that the Estoppel Certificate does not relieve Cinemaworld of liability for the unpaid portion of the actual 2006 Taxes. Indeed, any "Rent" payments made by Cinemaworld through May 31, 2006 — which would have been comprised of Minimum and Additional Rent — would only have included the estimated monthly Taxes and not the actual Taxes which are not calculated and billed until year-end. Therefore, despite its representations in the Estoppel Certificate, the Court finds that Cinemaworld is not relieved of having to pay its reasonable share of the actual Taxes billed at the end of 2006, including the difference between the estimated and actual Taxes for the period prior to May 31, 2006.
 B Negligence
In Count III of the Amended Counterclaim, Defendant has asserted a claim of negligence against Plaintiff. Defendant contends that Plaintiff negligently failed to maintain adequate protection against power surges, resulting in a loss of power and profits to Defendant. Plaintiff seeks summary judgment, arguing that the economic loss doctrine and the plain language of the Lease preclude such a claim of negligence.
To establish a cause of action for negligence, the plaintiff must allege four elements: (1) a legally cognizable duty owed by defendant to plaintiff; (2) breach of such duty; (3) that the *Page 15 
conduct proximately caused the injury; and (4) actual loss or damage. Medeiros v. Sitrin, 984 A.2d 620, 625 (R.I. 2009) (citing Santana v. Rainbow Cleaners, Inc.,969 A.2d 653, 658 (R.I. 2009)). A plaintiff who asserts a cause of action based on negligence has the burden to "establish a standard of care and prove, by a preponderance of the evidence, that the defendant deviated from that standard of care." Id. (quotingRiley v. Stone, 900 A.2d 1087, 1095 (R.I. 2006)).
 1 Economic Loss Doctrine
Under the economic loss doctrine "a plaintiff is precluded from recovering purely economic losses in a negligence cause of action."Franklin Grove Corp. v. TNT Bldg. Corp.,936 A.2d 1272, 1275 (R.I. 2007) (quoting BostonInv. Prop. No. 1 State v. E.W. Burman, Inc.,658 A.2d 515, 517 (R.I. 1995)). Accordingly, a plaintiff may not recover damages under a negligence claim without suffering a personal injury or property damage. Id. Under Rhode Island law, the economic loss doctrine is limited to disputes involving commercial entities and is not applicable to consumer transactions.Id.
At first glance it would seem that the economic loss doctrine would bar Defendant's claim of negligence. Cinemaworld did not suffer personal injury or property damage and is claiming purely economic damages. However, in E.W. Burman, our Supreme Court, when discussing the purpose of the economic loss doctrine, stated that "it is appropriate for sophisticated commercial entities to utilize contract law to protect themselves from economic damages."Id. Here, the parties have done just that.
The Lease specifically provided that "[e]xcept if caused by Landlord's negligence or willful misconduct, neither Landlord nor its agents shall be liable to Tenant for any loss, injury *Page 16 
or damage to Tenant or to any other person, or to its or their property, irrespective of the cause of such injury, damage or loss. . . ." (Lease § 14.07.) Accordingly, the parties have specifically contracted for the right of Cinemaworld to bring a negligence cause of action for any losses sustained. Therefore, the Court finds as a matter of law that Defendant's negligence claim is not barred by the economic loss doctrine.
 2 Sufficiency of the Claim
Summary judgment is generally not appropriate in connection with a negligence claim. Splendorio v. Bilray Demolition Co.,682 A.2d 461, 467 (R.I. 1996) (noting that "the determination of proximate cause . . . is a question of fact that should not be decided by summary judgment"); see also Seide v. State,875 A.2d 1259, 1268 (R.I. 2005) (quoting Rodrigues v. MiriamHosp., 623 A.2d 456, 461 (R.I. 1993) (stating that "`the existence and the extent of a duty of care are questions of law . . . [, but] whether such duty has been breached and whether proximate cause [exists] are the questions for the factfinder'"). However, the party opposing summary judgment may not rest upon mere allegations or denials in its pleading and has an affirmative duty to set forth specific facts showing a genuine issue of fact to be resolved at trial. Ouimette v. Moran,541 A.2d 855, 856 (R.I. 1988). The failure to set forth such facts will result in summary judgment entered against the party opposing the motion. Ardente v. Horan,117 R.I. 254, 257-58, 366 A.2d 162, 164 (1976).
In the instant matter, several elements of Defendant's claim fail as a matter of law. First, the Court finds that Defendant's mere allegation of "inadequate equipment" is insufficient to establish a genuine issue of fact with respect to Plaintiff's alleged negligence. Russian v. Life-Cap Tire Servs., Inc.,608 A.2d 1145, 1147 (R.I. 1992) (noting that a party must assert sufficient *Page 17 
facts to satisfy the necessary elements of his negligence claim). The statement in Rick Starr's Affidavit — Cinemaworld's CEO — that Cinemaworld incurred a loss of business and profits because of "inadequate equipment" fails to rise above a mere allegation or raise a genuine issue as to the adequacy of the surge protector.
Moreover, under the facts as presented, the Court declines to find that a duty existed between Inland and Cinemaworld in connection with the surge protectors and provision of electricity. Indeed, the Lease contained no requirement for the provision of a particular surge protector, and expressly stated:
 "Tenant shall pay when due all costs, charges . . . related to the hook-up, furnishing, consumption, maintenance and installation of . . . electricity . . . light . . . power, and any other utilities or services (collectively `Utilities') attributable to servicing the Premises, whether located in or outside the Premises. Landlord shall have no liability to Tenant or any other party for any inadequacy, cessation, or interruption of Utilities." (Lease § 10.01) (emphasis added).
Therefore, where, as here, Defendant's negligence claim arises out of the inadequacy and cessation of Utilities, the Court finds that even when viewed in the most favorable light, the evidence fails to establish a genuine issue as to duty or liability.
Finally, Defendant has failed to establish recoverable damages. Although Cinemaworld seeks recovery for lost profits and business, under the Lease, "neither Landlord nor it agents, even if negligent, shall be liable for consequential damages arising out of any loss of use of the Premises or any equipment, facilities or other Tenant's property therein by Tenant or any person claiming through or under Tenant." Id. § 14.07. Consequential damages are such damages "that do not flow directly and immediately from an injurious act but that result indirectly from the act." Riley v. Stafford,896 A.2d 701, 703 (R.I. 2006) (citingBlack's Law Dictionary 416 (8th ed. 2004)). Here, the lost profits and business were merely a consequence of the loss of power *Page 18 
and use of the Premises, and therefore, recovery is expressly barred by the Lease.[11] K.C. Props. of N.W. Ark., Inc. v. LowellInv. Partners, LLC, 373 Ark. 14, 24, 280 S.W.3d 1, 10 (Ark. 2008) (stating that "lost profits are well recognized as a type of consequential damages"); Howard Opera House Assocs. v. UrbanOutfitters, Inc., 166 F. Supp.2d 917, 934 (D. Vt. 2001) (holding that where lease provided that neither landlord nor tenant could recover consequential damages, it precluded party's recovery of lost income or profits); Perini Corp. v. Greate BayHotel Casino, Inc.,129 N.J. 479, 498, 610 A.2d 364, 374 (N.J. 1992) (stating that lost profits fall under the category of consequential damages) (overruled on other grounds). Consequently, in light of Defendant's failure to plead facts establishing recoverable damages, and for the additional reasons set forth herein, the Court grants summary judgment to Plaintiff on Count III of the Amended Counterclaim.
 IV Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court grants Defendant's motion for partial summary judgment as to Count II of its Amended Counterclaim for an accounting. Although the Court grants Plaintiff's motion for summary judgment as to Count III of Defendant's Amended Counterclaim for negligence, the Court denies summary judgment as to Counts I, II, and IV in light of the determinations contained herein. The Court further finds that Defendant's reasonable share of the Taxes should be calculated by: (1) taking the entire tax bill for the Shopping Center; (2) excluding the taxes attributable to the parking and common areas; (3) and multiplying the remaining tax bill by a *Page 19 
fraction, the numerator of which is the square footage of the Building, and the denominator of which is the current leasable square footage of the Shopping Center which is not separately assessed to other tenants. Moreover, the Court finds that the Estoppel Certificate does not relieve Cinemaworld of having to pay its reasonable share of the actual Taxes billed at the end of 2006, including the difference between the estimated and actual Taxes for the period prior to May 31, 2006. While a construction of the Lease was ripe for resolution as a matter of law, the Court finds, however, that there is insufficient information by which to conclude as a matter of law that Cinemaworld has breached the Lease, and therefore, denies summary judgment as to Count I of Plaintiff's Complaint. Finally, the Court finds that at this juncture, each party must bear its own attorney's fees, costs, and expenses.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record. Counsel shall also arrange for a time to meet with the Court for the purpose of scheduling such further proceedings, if any, as may be appropriate under the circumstances.
[1] Capitalized terms, unless otherwise defined herein, have the meaning assigned to them in the Lease, as amended.
[2] On or about December 10, 2004, Cinema World, Inc. assigned all of its right, title, and interest as Tenant under the Lease to Cinemaworld.
[3] "Land" is defined as the area "shown cross-hatched on the Preliminary Site Plan attached as Exhibit B to the Lease." (Lease § 1.01.) "Building" is defined as the "building to be constructed on the Land by Tenant as described in Section 6.01."Id. "Improvements" is defined as "the improvements to be constructed thereon by Tenant pursuant to the terms of the Lease . . . and such other improvements as Tenant may from time to time construct." Id. § 2.02.
[4] The Common Area Maintenance Costs are the "total costs and expenses incurred in operating, maintaining, managing, insuring and repairing all or any part of the Common Area. . . ." (Lease § 8.03.) Common Area is defined as
 "[a]ll areas and space provided for the common or joint use and benefit of tenants in the Shopping Center (including any expansion thereof to adjacent and contiguous land), their employees, agents, and invitees, including without limitation, parking areas, access roads, driveways, retaining walls, landscaped areas, truck serviceways or tunnels, pedestrian walks, outside courts and curbouts, and . . . [a]ll other non-leasable portions of the Shopping Center." Id. § 8.02.
Taxes and Utilities were among the expenses not included in the Common Area Maintenance Costs. Id. § 8.03.
[5] See supra note 3.
[6] For tax year 2008, Inland increased Cinemaworld's monthly estimated tax payments to $14,298.75 and billed this amount beginning in November 2008. "Catch Up Billing" reflected the difference between the estimated payments made from January 2008 through October 2008 and the increased monthly tax payments. Inland intended for Catch Up Billing to reduce the amount paid by Cinemaworld when the year-end adjustment between estimated and actual Taxes billed was calculated.
[7] See supra note 3.
[8] Under section 8.04, Cinemaworld was required to pay Landlord, as Additional Rent, Landlord's reasonable estimate of one-twelfth of Tenant's Proportionate Share of the Common Area Maintenance Costs for the then current calendar year. (Lease § 8.04). Said estimate was determined by multiplying Landlord's estimate of the monthly Common Area Maintenance Costs by Tenant's Proportionate Share.Id. Tenant's Proportionate Share is a fraction, "the numerator of which is the leasable floor area of the Building and the denominator of which is the leasable area of all buildings on the Shopping Center as of the first day of the applicable calendar year to which Common Area Maintenance Costs relate." Id.
[9] Defendant points to the language of section 25.01 requiring "Tenant [to] pay to Landlord Tenant's reasonable share [of the Charges] as reasonably determined by Landlord in consultation with Tenant," and argues that Plaintiff is prohibited from unilaterally imposing a formula for determining Defendant's share of Taxes. The Court finds this argument unavailing. Cinemaworld does not dispute the general formula used to calculate its reasonable share, and this language may not be read to negate Defendant's responsibility under Article 9 to pay its reasonable share of Taxes or Charges assessed on its Land, Building, and Improvements.
[10] As a result of the foregoing determinations, the Court denies Plaintiff's motion for summary judgment as to Count I, seeking a declaratory judgment, and Count IV, seeking injunctive relief, of Defendant's Amended Counterclaim.
[11] The Court notes that the issue of whether damages are consequential or direct is a question of law and properly determined on summary judgment. See Chestnut Hill Dev. Corp. v. OtisElevator Co., 739 F. Supp. 692, 701 (D. Mass. 1990).