**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 5, 2014**

# In the Court of Appeals of Georgia

A14A0145. ASSAF v. CINCINNATI INSURANCE COMPANY.

PHIPPS, Chief Judge.

In this insurance coverage dispute, Eugene F. Assaf, the insured, appeals from the trial court's order granting summary judgment to Assaf's insurer, Cincinnati Insurance Company. For the reasons set forth below, we agree with Assaf that issues of material fact remain as to whether he was entitled to $1,000,000 in excess uninsured/underinsured motorist coverage. Accordingly, we reverse.

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] We review the grant or denial of a motion for

---

[1] OCGA § 9-11-56 (c).

summary judgment de novo,[2] and we view the evidence, and the reasonable inferences drawn therefrom, in a light most favorable to the nonmovant.[3]

So viewed, the evidence shows that on August 10, 2009, an uninsured vehicle driven by Gerald Stein struck and injured Assaf as he was walking alongside a road. Assaf filed a personal injury action against Stein in the State Court of Fulton County and served Cincinnati with a copy of the complaint as Assaf's uninsured/underinsured motorist insurance carrier. Cincinnati answered in its own name and filed a cross claim against Stein. Assaf later amended his complaint to assert a claim against Cincinnati that refusal to provide $1,000,000 in uninsured/underinsured motorist coverage ("UM Coverage") constituted a breach of contract.

Before his injury, Assaf had applied to Cincinnati for automobile liability insurance and a personal liability umbrella policy through Little and Smith, Inc. ("L&S"), an insurance agency. On April 18, 2008, Assaf spoke by telephone with Joy Chastain, an L&S employee, and she bound Assaf's automobile and umbrella insurance coverage at that time. Assaf testified that during the telephone conversation

---

[2] *See Woodcraft by MacDonald, Inc. v. Ga. Cas. and Sur. Co.*, 293 Ga. 9, 10 (743 SE2d 373) (2013).

[3] *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

2

he told Chastain that he wanted an umbrella policy which included $1,000,000 in UM Coverage. On April 25, 2008, Assaf went to the offices of L&S, where he signed documentation pertaining to the insurance and received copies of the automobile and umbrella insurance policies issued to him by Cincinnati.

The automobile policy, as issued, provided liability and UM Coverage of $100,000, each person, and the umbrella policy provided coverage of $1,000,000, each occurrence. The umbrella policy, however, did not provide excess UM Coverage.[4] The lack of such coverage was consistent with the umbrella policy application submitted by L&S to Cincinnati. The umbrella policy application included a coverage rejection form on which a box indicating, "I reject Excess Uninsured/Underinsured Motorists Coverage under this policy" was checked, and which was purportedly signed by "Eugene F. Assaf."

Notwithstanding what appeared on the application, Assaf testified that he did not sign the form rejecting excess UM Coverage under the umbrella policy and that he did not check the box indicating his rejection of such coverage. Rather, Assaf

---

[4] The declarations page of the umbrella policy refers to an "Excess Uninsured/Underinsured Motorist Coverage Exclusion," although the parties have not identified what the exclusion actually says. However, no one contends that the express (as opposed to the implied) terms of the umbrella policy included UM Coverage.

contends, his signature was forged by Chastain, who was the only other person who had access to the insurance applications before they were submitted to Cincinnati, and who was later asked to resign from L&S because, among other things, she had signed another insured's name to a policy cancellation without that insured's consent.

Acknowledging that Assaf contended that the signature evidencing a rejection of excess UM Coverage was not his, Cincinnati moved for summary judgment, arguing that even assuming Assaf's signature was forged: (i) Cincinnati reasonably relied on the application in issuing coverage; (ii) Cincinnati could not be held liable for the alleged wrongful acts of an independent insurance agent; and (iii) Assaf was precluded from seeking excess UM Coverage because he had not read the umbrella policy. Cincinnati asked the trial court to limit its liability to $100,000 and to rule that Assaf was not entitled to recover an additional $1,000,000 in excess UM Coverage.[5] The trial court granted the motion and entered final judgment in favor of Cincinnati.

1. On appeal, Assaf contends that because there remain genuine issues of material fact, particularly as to whether he signed the rejection of the excess UM

[5] Cincinnati also asked for summary judgment on the issues of punitive damages and bad faith attorney fees but, as Cincinnati notes, those claims are not addressed in the trial court's ruling or in Assaf's appeal. Accordingly, we do not address them here.

4

Coverage and whether L&S was the dual agent of Assaf and Cincinnati, the trial court erred in granting summary judgment to Cincinnati. We agree.

(a) At the time Cincinnati issued Assaf's original umbrella policy, Georgia law required that "without a written waiver, all automobile policies provide UM Coverage equal to the policies' overall liability limits."[6] Umbrella and excess policies that included motor vehicle or automobile liability coverage were then subject to this requirement.[7] Thus, absent other considerations, if Assaf did not reject the excess UM

---

[6] *Abrohams v. Atlantic Mut. Ins. Agency*, 282 Ga. App. 176, 180 (1) (638 SE2d 330) (2006). See OCGA § 33-7-11 (a) (1), (3) (2008) ; *St. Paul Fire & Marine Ins. Co. v. Hughes*, 321 Ga. App. 738, 742 (742 SE2d 762) (2013) (finding that as "there was no written rejection of UM benefits for the Policy, the Policy's UM exclusion conflicts with the plain terms of OCGA § 33-7-11 and was therefore void"). Effective as of January 1, 2009, OCGA § 33-7-3 was amended to provide that "[t]he coverage required under [OCGA § 33-7-11 (a) (1)] excludes umbrella or excess liability policies unless affirmatively provided for in such policies or in a policy endorsement." Ga. L. 2008, p. 1192, § 1, 5. The umbrella policy at issue here, originally issued April 18, 2008, was renewed for a policy period of April 18, 2009 to April 18, 2010, and so a renewal policy was in effect when Assaf was allegedly struck by Stein's vehicle on August 10, 2009. For purposes of this appeal, the parties do not contend that the renewal policy, albeit issued after the January 1, 2009 effective date of the 2008 amendment to OCGA § 33-7-3, had any less coverage than the original policy. See generally OCGA § 33-24-45 (b) (2) ("'Renewal' means issuance and delivery by an insurer of a policy superseding at the end of the policy period a policy previously issued and delivered by the same insurer and providing no less than the coverage contained in the superseded policy . . . .").

[7] See *Abrohams*, supra at 180 (1).

Coverage in writing, then, even if his "original policy purported to exclude uninsured motorist coverage, such coverage was required by law and, therefore, implied into [his] original policy by operation of law."[8]

(b) Cincinnati maintains that it was nevertheless entitled to rely on the apparent rejection of UM Coverage in the application even if Assaf did not actually sign the rejection. Generally, "it is implicit that an insurer is entitled to rely on statements of an applicant as true, without conducting an independent investigation."[9] For example, where an insured contended that an independent insurance broker forged his signature on an insurance application, but there was no evidence that the insurance broker was the agent of the insurer, we found that the authenticity of the signature was not material to the insurer's liability under the policy.[10]

---

[8] *Wilson v. The Automobile Ins. Co. of Hartford, Conn.*, 293 Ga. 251, 252 (744 SE2d 732) (2013).

[9] *Graphic Arts Mut. Ins. Co. v. Pritchett*, 220 Ga. App. 430, 432 (2) (469 SE2d 199) (1995).

[10] *Morris v. Fidelity & Cas. Co. of N. Y.*, 169 Ga. App. 883 (1) (315 SE2d 451) (1984). Accord *National Indem. Co. v. Smith*, 172 Ga. App. 415, 415-416 (323 SE2d 274) (1984) (holding that "[w]here an insurer is compelled to issue a policy of automobile insurance pursuant to the Georgia assigned risk plan, based upon an application initially taken by an insurance broker not acting as the insurer's agent, a dispute over the authenticity of the signatures on the application is not material to the issue of the insurer's liability for optional PIP benefits.").

6

Here, however, Assaf contends that L&S was not only his agent, but also the agent of Cincinnati.[11] And, as to this point, Cincinnati represented to the trial court that for the purpose of its motion for summary judgment Cincinnati assumed that L&S was the dual agent of both Cincinnati and Assaf.[12] As a rule,

> where an agent represents two adverse parties in a transaction with the knowledge and consent of both, neither principal is liable to the other for the tortious acts of the agent so situated where the opposite principal is not in complicity with the agent or in no way participates in the tortious act. Another way of stating this same principle is that the

---

[11] Assaf points to evidence that, among other things, L&S had the authority to collect premiums on behalf of Cincinnati and to bind insurance coverage for Cincinnati. See *Bowen Tree Surgeons, Inc. v. Canal Indem. Co.*, 264 Ga. App. 520, 523 (591 SE2d 415) (2003) (finding that where independent agent customarily accepted premiums and notices of claims on insurer's behalf, questions of fact remained as to whether the agent acted as a dual agent). Compare *Canal Ins. Co. v. Harrison*, 189 Ga. App. 681, 683 (1) (376 SE2d 923) (1988) (concluding that, among other things, there was a lack of evidence that insurance agent was an agent of the insurer where unequivocal testimony showed that the agent could not bind coverage for the insurer).

[12] Cincinnati argues that L&S was its independent contractor and not its employee, such that the alleged fraud by L&S could not be imputed to Cincinnati. See, e.g., *Fieldstone Center, Inc. v. Stanley*, 216 Ga. App. 803, 805 (3) (456 SE2d 61) (1995) (noting that "[g]enerally, an employer is not responsible under the theory of respondeat superior for the torts of one employed as an independent contractor") (citation and punctuation omitted). Cincinnati does not show, however, as discussed below, that if L&S was also its agent, Assaf's claim for coverage under the contract, as opposed to a tort claim, would be precluded by a showing that L&S was an independent contractor.

7

misconduct of a dual agent by consent cannot be imputed to either of the principals who is not actually at fault, since each of the principals is under an equal duty to exercise ordinary care in selecting and supervising the agent to protect his own interest.[13]

Notwithstanding the foregoing, Georgia law, pursuant to OCGA § 10-6-56, also provides that "[t]he principal shall be bound by all representations made by his agent in the business of his agency and also by his willful concealment of material facts, although they are unknown to the principal and known only by the agent." In considering whether this statute is negated by the rule that neither principal is civilly liable to the other for the tortious conduct of the dual agent, absent participation or collusion in such acts, our Supreme Court has held that "equity will not allow [a principal] to be relieved of responsibility for misrepresentations of the dual agent upon which the other principal relied to his detriment when the action is in contract."[14] Thus, an insurer cannot "escape the usual effects of estoppel because the agent is also the agent of the insured party."[15]

---

[13] *Home Materials, Inc. v. Auto Owners Ins. Co.*, 250 Ga. 599, 602 (2) (300 SE2d 139) (1983) (citation and punctuation omitted).

[14] Id. at 603 (2).

[15] Id. See, e.g., *GFA Business Solutions, Inc. v. Greenway Ins. Agency*, 243 Ga. App. 35, 36 (1) (531 SE2d 134) (2000) (finding that "[a]n insurance company clearly

8

This court applied the foregoing holding in *Southern Guaranty Ins. Co. v. Cotton States Mut. Ins. Co.*,[16] a dispute which, as in this case, involved allegations that an insured's signature on a coverage rejection form had been forged. At the time Southern Guaranty issued the insurance policy in question, Georgia law required insurers to offer certain optional personal injury protection coverage to applicants for no-fault insurance and required waiver of such coverage to be made knowingly and in writing.[17] Following an accident, the insureds sued their insurer, Southern Guaranty, to recover additional personal injury benefits that they claimed were not offered to them as required by statute.[18] The trial court directed a verdict to the insureds on the coverage issue at trial, and we affirmed that ruling, noting that "the evidence is uncontroverted that the [insureds] did not knowingly and in writing waive their right to obtain" the optional coverage.[19] Although the signature of a named

may be held liable for the fraud, misconduct, or negligence of an agent in an action for a breach of an insurance contract").

[16] 176 Ga. App. 140, 143 (3) (335 SE2d 598) (1986).

[17] Id. at 142 (3). See *Flewellen v. Atlanta Cas. Co.*, 250 Ga. 709, 714 (300 SE2d 673) (1983).

[18] *Southern Guaranty*, supra at 141.

[19] Id. at 142-143 (3).

9

insured appeared on the coverage rejection form, the evidence was undisputed that neither insured signed the rejection form or authorized anyone else to sign the form on their behalf.[20] Furthermore, the insurance agent that submitted the application occupied the status of a dual agent.[21] Noting that, in contract, a principal may be held liable for the misrepresentations of a dual agent on which the other principal detrimentally relied, we held that "any knowledge by the employees of the [insurance agent] that the signature on the form was not authentic was imputable to Southern Guaranty for the purpose of establishing its liability on the policy."[22]

In this case, the trial court distinguished *Southern Guaranty* on the ground that Assaf did not contend that Cincinnati was complicit in any wrongdoing by L&S or Chastain. In *Southern Guaranty,* this court found as to the insureds' claims for a bad-faith penalty, attorney fees, and punitive damages that the trial court erred in refusing to charge the jury that Southern Guaranty could not be liable to the insureds unless it was in complicity with the dual agent or participated in forgery.[23] This holding,

---

[20] Id. at 140, 142 (3).

[21] Id. at 143 (3).

[22] Id.

[23] Id. at 144 (6).

10

however, did not affect our affirmance of the directed verdict in favor of the insureds on the coverage issue, and we reiterated that "[a]lthough a principal may be liable to the other principal *in contract* for the misrepresentations of a dual agent, neither principal is liable to the other for the tortious acts of the dual agent, where the opposite principal is not in complicity with the agent or in no way participates in the tortious act."[24]

In light of *Southern Guaranty*, if L&S's employee signed Assaf's name on the form as rejecting excess UM Coverage without his authorization, and L&S was the dual agent of Cincinnati and Assaf, then knowledge that Assaf's signature was not authentic could be imputed to Cincinnati. Under such circumstances, Cincinnati could not prevail on Assaf's contract claim either by claiming that it was entitled to rely on the purported signature as an apparent rejection by Assaf of the excess UM Coverage or by claiming that it could not be held liable in tort for the misrepresentations of L&S.[25]

---

[24] Id. (emphasis supplied; citation and punctuation omitted).

[25] See id. at 143 (3) (distinguishing authority that insurer could rely on authenticity of signed rejection form where the agent that submitted the application could not have been the agent of the insurance company). Compare *Canal Ins. Co.*, supra, 189 Ga. App. at 683-684 (1) (finding that because there was no evidence that the independent broker represented the insurer, the insurance company could not be

11

(c) Cincinnati argues that it was also entitled to summary judgment because (i) Assaf failed to examine the policy documents for errors and was thereby estopped from challenging the terms of the insurance contract, and (ii) Assaf's contractual claims were actually claims for equitable relief through reformation and, as such, beyond the jurisdiction of the State Court of Fulton County. We disagree.

Generally, an insured has a "legal duty to examine his contract, observe what coverage it provided to him, and, if the coverage was not correct, either reject the policy as written when tendered or renegotiate his contract with the insurer."[26] "[A]nd if the applicant neglects to examine the policy delivered to him the contract is binding."[27] An insured's failure to read an insurance contract will not bar an action

held liable to the insured in contract on the basis of the agent's alleged misrepresentations).

[26] *Barnes v. Levenstein*, 160 Ga. App. 115, 116 (286 SE2d 345) (1981) (citation and punctuation omitted).

[27] *Southern Gen. Ins. Co. v. Mathis,* 183 Ga. App. 823, 826 (3) (360 SE2d 19) (1987) (citation and punctuation omitted). See *Parris & Son v. Campbell*, 128 Ga. App. 165, 173-174 (13) (196 SE2d 334) (1973).

12

for reformation of the contract,[28] although such affirmative equitable relief is within the jurisdiction of the superior courts.[29]

Accepting, arguendo, that Assaf did not examine the insurance policy after it was issued, Assaf may not be barred thereby from claiming excess UM Coverage. As we explained above, if Assaf did not reject the excess UM Coverage in writing then such coverage was "implied into [his] original policy by operation of law," even if Cincinnati's policy purported to exclude such coverage.[30] Cincinnati argues that without a burden of inspection an insured could later collect unbargained-for benefits by claiming that an insurer failed to include desired coverage. In this case, however, in light of unresolved issues of fact, the policy as issued by Cincinnati may have included the excess UM Coverage notwithstanding a stated exclusion. Assaf's failure to discover or object to an ineffective exclusion of UM Coverage "will not serve to bar [Assaf] from seeking to recover benefits pursuant to such coverage as was

---

[28] *Ga. Farm Bureau Mut. Ins. Co. v. Wall*, 242 Ga. 176, 179-180 (2) (249 SE2d 588) (1978).

[29] See OCGA § 23-1-1 ("All equity jurisdiction shall be vested in the superior courts of the several counties."); *Parris & Son*, supra, 128 Ga. App. at 174 (15) (noting that a state court would not have jurisdiction of a claim for reformation of contract).

[30] *Wilson*, supra.

13

provided to [him] as a matter of law."[31] Similarly, if the policy provided the UM Coverage by operation of law, Assaf need not reform the contract to receive the benefit of that coverage, and Cincinnati fails to show Assaf's claim for breach of contract was beyond the jurisdiction of the state court.

In light of the foregoing, we conclude that because genuine issues of material fact remain for a trier of fact, the trial court erred in granting Cincinnati's motion for summary judgment.

2. In light of our holding in Division 1, we need not address Assaf's other claims of error.[32]

*Judgment reversed. Ellington, P. J., and McMillian, J., concur.*

---

[31] *Southern Gen. Ins. Co.,* supra at 827 (3).

[32] See, e.g., *Ly v. Jimmy Carter Commons, LLC*, 286 Ga. 831, 833 (2) (691 SE2d 852) (2010).