**FOURTH DIVISION**
**ELLINGTON, P. J.,**
**BRANCH and MERCIER, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**March 6, 2017**

# In the Court of Appeals of Georgia

A16A1812. ONE BUCKHEAD LOOP CONDOMINIUM JE-067 ASSOCIATION, INC. v. REGENT TOWER HOLDINGS, LLC f/k/a REGENT TOWER HOLDINGS, INC.

ELLINGTON, Presiding Judge.

In a complaint filed in 2015, One Buckhead Loop Condominium Association, Inc. ("the Association") sued Regent Tower Holdings, LLC f/k/a Regent Tower Holdings, Inc. ("Regent") for breach of contract, among other claims, contending that Regent breached the terms of an easement agreement in which Regent had granted the Association, subject to certain limitations, a perpetual non-exclusive right to access Regent's private road system. The trial court subsequently granted Regent's motion for summary judgment on all of the Association's claims. On appeal, the Association contends that the trial court erred in finding that it was estopped from asserting that Regent breached the easement agreement on the ground that, in 2006,

it had executed an estoppel certificate certifying that there were no defaults thereunder. We reverse for the reasons set forth below.

Under OCGA § 9-11-56 (c),

[s]ummary judgment is warranted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. We review the grant or denial of a motion for summary judgment de novo, and we view the evidence, and the reasonable inferences drawn therefrom, in a light most favorable to the nonmovant.

(Punctuation and footnotes omitted.) *Assaf v. Cincinnati Ins. Co.*, 327 Ga. App. 475, 475-476 (759 SE2d 557) (2014).

So viewed, the evidence shows that, in 1995, Regent and Buckhead Station, LLC entered into an "Easement Agreement for Access and Utilities." Thereunder, among other things, Regent granted, for the benefit of Buckhead Station, a perpetual non-exclusive easement for passenger vehicle and pedestrian egress, ingress, and access over and through a private roadway system constructed on Regent's property. Regent acknowledges that the Association is a successor-in-interest to Buckhead Station and has a right to enforce the Easement.

2

The Easement contemplates that Regent may close its roadway system, which is located in the Buckhead area of Atlanta, during rush hour.[1] In that respect, the Easement affords Regent the exclusive right to determine the location and the control mechanisms used to restrict or prohibit vehicular traffic. The Easement further provides, however, that, "[t]o the extent any vehicular traffic is allowed through such control points, [the Association] shall have the same vehicular access through such control point."

From the time the road system was constructed in 1996, Regent has closed the roadway system during rush hour. In 2003, Regent entered into an agreement with Buckhead Community Improvement District ("BCID") to allow the District's shuttle bus (the "BUC") to travel over its roadway system. Beginning in 2004, Regent installed traffic control gates that are lowered during rush hour. The BUC is allowed to open the traffic gate through the use of a remote electronic device. Security guards employed on properties contiguous to the roadway system also have the ability to raise the traffic gate through a remote electronic device.

---

[1] Specifically, Section 5.5 of the Easement provides that "Regent shall have the right to restrict or prohibit the flow of vehicular traffic on the Regent Roadway System at such points as it deems necessary or desirable during the periods from 7:00 a. m. to 9:30 a.m. and from 4: 30 p.m. to 6: 30 p.m. daily."

In 2006, in connection with a development project in which Regent was involved, the Association executed the Estoppel Certificate[2] at issue. Therein, the Association acknowledged, among other things, that "to the best actual knowledge of the principal officers of the [Association], no default, or event with the passage of time or the giving of notice, or both, [that] would constitute a default on the part of [Regent]" had occurred under the Easement. The Estoppel Certificate affirmed that Regent "may rely upon the statements set forth herein." The Easement also provides that "[a]ny . . . entity requesting an . . . Estoppel Certificate concerning this Agreement shall be entitled to rely on . . . an Estoppel Certificate" from a party authorized to represent the Association.

In 2015, the Association sued Regent for breach of contract, among other claims, alleging that Regent had violated the Easement by selectively allowing vehicular access through the traffic control gate during closure of the roadway

---

[2] An estoppel certificate is a signed statement by a party certifying for another's benefit that certain facts are correct, such as that a lease exists, that there are no defaults, and that rent is paid to a certain date. A party's delivery of this statement estops that party from later claiming a different state of facts.

(Citation and punctuation omitted.) *Fundus America (Atlanta) Ltd. Partnership v. RHOC Consolidation*, 313 Ga. App. 118, 119 n. 7 (720 SE2d 176) (2011).

4

system, including the BUC and private security vehicles, to the exclusion of the Association. The Association also sought, among other claims, injunctive and declaratory relief. Regent moved for summary judgment on all claims. The trial court granted summary judgment to Regent, finding that the Association is estopped from contending that Regent breached the Easement by permitting the BUC and the security guards to travel over the roadway system without permitting the Association to engage in the same known conduct.

1. The Association contends that the trial court erred in finding that Regent was entitled to judgment as a matter of law. More specifically, the Association argues that a jury should decide whether Regent reasonably relied on the Estoppel Certificate. The Association also argues that any estoppel arising from the Estoppel Certificate did not extend to the alleged breaches of the Easement arising after the date of that certificate.

(a) The law in Georgia "recognizes, on grounds of public policy and good faith, that the execution of an estoppel certificate can create an estoppel effect against future claims for damages." (Punctuation and footnote omitted.) *Fundus America (Atlanta) Ltd. Partnership v. RHOC Consolidation*, 313 Ga. App. 118, 121 (1) (a) (720 SE2d 176) (2011). In other words, "a party who executes an estoppel certificate

5

should not be allowed to raise claims of which it knew or should have known at the time the certificate was executed." (Citation and punctuation omitted.) Id. at 122 (1) (b).

By executing an estoppel certificate, "a party can agree to be estopped under circumstances that might not otherwise constitute an estoppel under common law." Id. at 121 (1) (a) (rejecting argument that party claiming benefit of estoppel certificate was required to prove elements of equitable estoppel, including proof of some concealment or false representation, in order to prevail on summary judgment). Nevertheless, a party asserting the benefit of an estoppel certificate must show that it reasonably relied thereon. See *Office Depot v. The District at Howell Mill*, 309 Ga. App. 525, 527-529 (1) (710 SE2d 685) (2011) (finding, in affirming grant of summary judgment to landlord on tenant's claim that the landlord had violated the lease, that there remained no issue of material fact as to the landlord's reasonable reliance on the tenant's certificate that landlord was not in default under the lease); *Bibb County v. Ga. Power Co.*, 241 Ga. App. 131, 137 (4) (525 SE2d 136) (1999) ("estoppel requires justifiable reliance on the opposing party's representations or conduct and a change in position to one's detriment").

6

The Estoppel Certificate stated that the Association had been advised that Regent was transferring a tract of real estate to another party, 3344 Peachtree, LLC, which was constructing thereon a mixed-use project consisting of approximately 471,000 rentable square feet of office space, 20,000 square feet of retail space, 100 residential condominium units, and associated parking spaces. The Estoppel Certificate further provided that 3344 Peachtree was obtaining financing for the project from a lender, and that Regent, 3344 Peachtree, and the lender "require from [the Association] an estoppel relating to the" Easement. A representative of Regent testified that, in reliance on the Estoppel Certificate, Regent conveyed property to 3344 Peachtree, which, in turn, borrowed money to finance the project. The Association suggests that, if it had refused to provide the Estoppel Certificate, Regent could have terminated the BUC's license to access its road system, and proceeded with the transaction. But whatever might have happened, the record shows only that the Association did give the Estoppel Certificate, and that Regent relied thereon in conveying its property to 3344 Peachtree.

The Association argues that, even if Regent relied on the Estoppel Certificate, its reliance was not reasonable or justified because it knew that it was in violation of the Easement in refusing the Association access through the traffic control gate while

7

allowing third parties unfettered access. In light of the principle that "[h]e who would have equity must do equity,"[3] the Association argues, Regent cannot use an estoppel certificate as a "trap" to engage in activities it knows are in breach of the Easement. Here, as of the date of the Estoppel Certificate, both parties were in a position to assess whether Regent was in breach of the Easement by allowing third parties through the traffic control gate at rush hour. Generally, "an estoppel cannot result where both parties have equal knowledge or equal means of knowing the truth." (Punctuation and footnote omitted.) *Fundus America (Atlanta) Ltd. Partnership v. RHOC Consolidation*, 313 Ga. App. at 122 (1) (b). But, as we have previously found, the parties "may also contract around this rule of law," and they may do so, in the context of an estoppel certificate, by agreeing that a party shall have the right to rely on representations set forth in the certificate. (Punctuation and footnote omitted.) Id. Because the Association agreed in the Estoppel Certificate that Regent "may rely upon the statements set forth herein," Regent could reasonably do so, notwithstanding that it was aware that the BUC and security guards had access through the gate at rush hour. Further, there is no evidence of any inequitable conduct on the part of Regent, which has consistently denied that the BUC's passage through the gate during rush

[3] OCGA § 23-1-10.

8

hour constitutes a default under Easement, in an attempt to "trap" or deceive the Association through the Estoppel Certificate. Therefore, the Association does not show that there remains an issue of material fact as to Regent's reasonable reliance on the Estoppel Certificate in its conveyance of its real property to 3344 Peachtree.

(b) The Association argues that, notwithstanding Regent's reasonable reliance thereon, the Estoppel Certificate does not bar claims arising after its execution. Specifically, the Association contends that the expansion of the BUC, which increased the frequency of passage through the traffic gate, gave rise to a breach of the Easement outside the scope of the Estoppel Certificate.

In *Fundus America*, we indicated that claims arising from the alleged breach of a lease that arose before the execution of an estoppel certificate were estopped thereby, and that claims for the breach of the lease that arose thereafter would not be estopped, but that the appellant had failed to come forward with evidence of any such post-certificate breach notwithstanding the trial court's specific invitation to do so. 313 Ga. App. at 124 (1) (d). In assessing whether the claims at issue here are estopped, we find persuasive the observation of the Appellate Court of Illinois that "[b]y their very nature, estoppel certificates look to the course of performance. In an estoppel certificate, the signer is certifying the course of performance has not

9

produced any defaults." *K's Merchandise Mart v. Northgate Ltd. Partnership*, 359 Ill. App. 3d. 1137, 1144, (II) (B), 296 Ill. Dec. 612 (835 NE2d 965) (2005).[4] In this case, the BUC and the security guards had been passing through the traffic control gate on Regent's roadway system before the Association executed the Estoppel Certificate certifying that there were no defaults under the Easement. We conclude that the Association had agreed that the course of performance at the time of execution of the Estoppel Certificate had not given rise to a default under the Easement, and the Association is estopped from asserting a claim of default arising out of the *same* course of performance.[5]

Nevertheless, we agree with the Association that evidence of changed conditions, specifically the change in the frequency in which the BUC passed through the traffic control gates, preclude the grant of summary judgment. The Association

---

[4] This Court also found *K's Merchandise Mart* to be persuasive authority in *Fundus America*. 313 Ga. App. at 122 (1) (b).

[5] See *Payless Shoesource, Inc. v. Joye*, No. 2:12-cv-00517-MCE-DAD, 2014 U.S. Dist. LEXIS 14372 (D. C. Calif., February 4, 2014) (Appellant's argument that its estoppel certificate could not be considered for conduct extending past its date of issuance was misplaced because the signer of an estoppel certificate is certifying that a course of performance has not produced any defaults, and, in that case, "the course of conduct both before and after the Estoppel Certificate was identical with respect to [the matter at issue.]").

10

points to evidence that, after the execution of the Estoppel Certificate, changes in the operation of the BUC arising out of a new operation agreement between BCID and a third party in 2012 caused the shuttle bus to pass through the control gate much more frequently. Specifically, the BUC routes were consolidated, and, the Association contends, the new schedule shows that the frequency of the buses passing through the traffic control point changed from between 15 and 30 minutes to between 9 and 12 minutes.

In its final order, the trial court held that "it is unpersuaded that the frequency of travel has increased, and thus[] invalidated the Estoppel Certificate." However, viewing the evidence in the light most favorable to the Association, as the nonmovant, the Association did come forward with evidence as to a change in the operation of the BUC and an increased frequency of passage by buses through the traffic control gate. Regency does not contest the factual basis of the Association's argument, but responds that the frequency of passage through the control point is irrelevant given that the Easement provides that the Association's right to access to the road at rush hour is triggered "[t]o the extent any vehicular traffic is allowed

11

through such control points[.]"[6] However, by its express terms, the Estoppel Certificate was a representation that "no default, or event with the passage of time or the giving of notice, or both, would constitute a default on the part of [Regent] . . . *has occurred*" (emphasis supplied), and it did not speak to future events. The Association points to an issue of fact as to whether Regent, subsequent to the Estoppel Certificate, altered its course of performance by allowing significant changes in third party access to its private roadway. It follows that Regent did not show, for purposes of its motion for summary judgment, that as a matter of law it is shielded by the Estoppel Certificate from the Association's breach of contract claim.

2. Regent contends that, even if this Court disagrees with the trial court's reasoning as to effect of the Estoppel Certificate, we must affirm its grant of summary

---

[6] The sentence referenced by Regent, provides, in full, that "[t]o the extent any vehicular traffic is allowed through such control points, the [Association] shall have the same vehicular access through such control point." At this time in the litigation, the Association's rights under the Easement have not been construed by the trial court as Regent's motion for summary judgment was based on estoppel, and, alternatively, the bar of the statute of limitation, and the trial court granted summary judgment to Regent on the Association's claim for declaratory judgment without reaching its merits. It is premature for this Court to assess whether the BUC's frequency of travel through the control point is wholly immaterial to the Association's rights under the Easement. For the purposes of addressing Regent's argument, however, we cannot conclude that, because the Easement refers to "any vehicular traffic," the Association is forever estopped from asserting a claim thereunder.

12

judgment under the principle of "right for any reason" because the Association's claims are time barred. Regent's arguments are premised on the six-year statute of limitations for breach of a written contract. OCGA § 9-3-24. Regent contends that the Association's breach of contract claim accrued in 2004, and that the statute of limitation for breach of a written contract bars the Association's breach of contract claim because it was not asserted until 2015. See *Gamble v. Lovett School*, 180 Ga. App. 708 (350 SE2d 311) (1986) ("the true test to determine when the cause of action accrued is to ascertain the time when the plaintiff could first have maintained his action to a successful result") (citation and punctuation omitted).

However, the statute of limitation for an action on an instrument under seal is 20 years, OCGA § 9-3-23, and, pretermitting whether Regent's limitation argument would otherwise have merit, it is not applicable to the extent OCGA § 9-3-23 applies. "The law is clear that to constitute a sealed instrument, there must be both a recital in the body of the instrument of an intention to use a seal and the affixing of the seal or scroll after the signature. It is also established that a contract may be under seal as to some parties and not as to others." (Citations and punctuation omitted.) *McCalla v. Stuckey*, 233 Ga. App. 397, 398 (504 SE2d 269) (1998). The body of the Easement provides that "the duly authorized representatives of Regent and Buckhead have

13

signed and sealed this Agreement as of the date and year first above written." Regent placed its corporate seal, containing the word "SEAL," adjacent to its signature. Regent argues that the presence of its corporate seal is insufficient to establish it signed the Easement under seal because the purpose of a corporate seal is to show that the individual signing the document on behalf of a corporation has the authority to do so. Further, Regent maintains, *Donalson v. Coca-Cola Co.*, 164 Ga. App. 712 (298 SE2d 25) (1982) is inconsistent with *McCalla*. See *Donalson*, 164 Ga. App. at 713 ("The contract between DHS and Coca-Cola was under both of their corporate seals. Thus, any action properly brought under the contract could be brought within 20 years. Code Ann. § 3-703 (now O.C.G.A. § 9-3-23)."). We decline Regent's implicit invitation to overrule *Donalson*. Rather, considering both *McCalla* and *Donalson*, we conclude that the Easement was an instrument under seal for purposes of OCGA § 9-3-23 because Regent's intent to seal the contract is shown in the body of the instrument, and, in light of that express intent, the impression of Regent's corporate seal is sufficient to constitute the affixing of the seal.

3. The Association contends that the trial court erroneously found that, in addition to barring its claim for breach of contract, the Estoppel Certificate barred its remaining claims for breach of the duty of good faith and fair dealing, specific

14

performance, injunctive relief, and declaratory judgment.[7] As the trial court erred in granting summary judgment on the Association's breach of contract claim, and it did not reach the merits of the Association's other claims, those claims remain outstanding as well.

*Judgment reversed. Branch and Mercier, JJ., concur.*

---

[7] The Association acknowledges that it informed the trial court at the motion for summary judgment hearing that it would not be proceeding with its claims for expenses of litigation and punitive damages.