**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**March 15, 2022**

# In the Court of Appeals of Georgia

A21A1433. DONROB INVESTMENTS, L. P. et al. v. 360 RESIDENTIAL, LLC et al.

DOYLE, Presiding Judge.

This appeal arises from the failure of DonRob Investments, L. P., and Donald Robinson Investments, Inc. (collectively "DonRob"), to consummate the sale of approximately 12 acres of real property located in Gwinnett County to 360 Residential, LLC, affiliate 360 Sugar Hill, LLC, and predecessor 360 Capital Company, LLC, (collectively "360") pursuant to a purchase and sale agreement ("the Agreement"). 360 filed a complaint for specific performance, breach of contract, and unjust enrichment, and it requested additional damages for bad faith and stubborn litigiousness pursuant to OCGA § 13-6-11. The trial court granted partial summary judgment to 360 and denied various other motions filed by DonRob. DonRob appeals,

arguing that the trial court erred (1) by granting 360 summary judgment as to its claim for specific performance; (2) by finding that the purchase and sale agreement permitted both monetary damages and specific performance; (3) by dismissing DonRob's counterclaim for breach of contract; and (4) by denying DonRob's motion to compel, motion to exclude expert testimony, and motions to strike. For the reasons that follow, we affirm in part and reverse in part.

Pursuant to OCGA § 9-11-56 (c),

[s]ummary judgment is warranted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. We review the grant or denial of a motion for summary judgment de novo, and we view the evidence, and the reasonable inferences drawn therefrom, in a light most favorable to the nonmovant.[1]

Viewed in this light, the record reveals that in March 2018, 360[2] entered into the Agreement to purchase 12 acres of an approximately 37-acre parcel of property

---

[1] (Punctuation and footnotes omitted.) *Assaf v. Cincinnati Ins. Co.*, 327 Ga. App. 475, 475-476 (759 SE2d 557) (2014).

[2] The 360 entity that entered into the Agreement later assigned its rights to another 360 entity.

owned by DonRob. The section being purchased by 360 was in the middle of the parcel and flanked by two sections over which DonRob would retain ownership. 360 planned to build apartments on the 12-acre site, which would require rezoning by the City of Sugar Hill, and DonRob planned to develop the remaining two portions into townhomes and commercial units. According to the Agreement,

> [r]ezoning may require a change in zoning classification, a change in zoning conditions, approval of a site plan amendment, or any combination of the foregoing. Purchaser shall not be obligated to accept any rezoning that is subject to any conditions to which Purchaser objects, in Purchaser's sole discretion. Purchaser shall use reasonable efforts to file any application for the Rezoning based on mutual agreement between Purchaser and Seller on the site plan and zoning application to be submitted to the City of Sugar Hill. Purchaser and Seller shall use commercially reasonable efforts to agree on a site plan and a joint development plan for the Seller Property prior to the last day of the Inspection Period. Seller reserves the right to review and approve all aspects of the site plan and joint development plan in order to insure that the proposed development plans contain adequate provisions for access to Seller's Property and does not have a materially adverse effect on Seller's ability to use Seller's Property for Seller's Use. The agreement between Purchaser and Seller on a proposed site plan and a joint development plan shall be memorialized in writing, and acknowledged by both Purchaser and Seller.

The property was successfully rezoned by December 2018, but there were a number of conditions that would need to be fulfilled as a result, including building two roads on the property. After agreeing on extensions of the closing date pursuant to the Agreement,[3] the sale of the property was scheduled to close on April 9, 2019.

According to the Agreement, the purchase price of no less than $6 million

> shall be paid at Closing in good funds immediately available in Atlanta, Georgia, on the Closing Date by bank wire transfer to an account designated in writing by Seller prior to Closing. Seller and Purchaser acknowledge and agree that the value of any Personalty is de minimis[,] and no portion of Purchase Price is allocated thereto.

Additionally, 360 was required to deliver by closing: "If applicable, a copy of an assignment of [360's] rights under this Agreement[;] [t]he closing statements described [herein; and] [s]uch other instruments, documents, affidavits, closing statements, certificates, or agreements reasonably requested by [DonRob's] counsel."

The Agreement contained the following Default Provisions:

24. DEFAULT BY PURCHASER.

---

[3] The Agreement stated that although certain extensions of specific lengths of time were available, "in no event may the Closing Date be extended beyond the Closing Deadline," which was defined as no later than 12 months after the date the Agreement was signed.

4

In the event that (a) Seller shall not be in default in any material respect in its performance of this Agreement, (b) no event shall have been occasioned by Seller that with the giving of notice, the passage of time, or both, would constitute a default or event of default under this Agreement, (c) Purchaser shall fail or refuse to purchase the Property from Seller except for as expressly permitted in this Agreement, and (d) such default shall continue uncured for more than ten (10) Business Days after Purchaser shall have received written notice from Seller of said default, then, in such event, Seller shall have the option to terminate this Agreement by giving written notice of termination to Purchaser and Escrow Agent, whereupon Escrow Agent shall pay to Seller all the Earnest Money being held by Escrow Agent, as liquidated damages, which shall be the sole remedy of Seller against Purchaser under this Agreement. Seller and Purchaser hereby agree that if Purchaser should fail or refuse to purchase the Property from Seller as provided in this Agreement, the amount of damages to Seller would be difficult, if not impossible, to determine, and the amount specified in this section as liquidated damages represents a good faith reasonable estimate by the parties of the amount of damages that Seller would incur in such event, and is not intended as a penalty.

## 25. DEFAULT BY SELLER.

In the event that (a) Purchaser shall not be in default in any material respect in its performance of this Agreement; and (b) no event shall have been occasioned by Purchaser that, with the giving of notice, passage of time, or both, would constitute a default or event of default by Purchaser under this Agreement, and Seller defaults in any material respect in its

performance of this Agreement, and said default shall remain in default for more than ten (10) Business Days after Seller receives specific notice of such default, then and in that event, Purchaser shall have the right to elect between the following options: (a) to declare this Agreement terminated and of no further force and effect, in which event Escrow Agent shall promptly refund to Purchaser all of the Earnest Money, or (b) maintain an action against Seller for specific performance of this Agreement. In the event that the remedy of specific performance is not available because of any willful or intentional act of Seller committed after the effective date of this Agreement and prior to the deadline date for Closing established in Paragraph 5 above, then, and in such event, Purchaser may seek to recover from Seller out-of-pocket expenses incurred in connection with the negotiation and preparation of this Agreement, due diligence investigations and reviews, proposals, surveys, site plans, environmental assessments[,] and rezoning expenses, all of which shall be capped at . . . $250,000. . . . The remedies set forth herein are the Purchaser's sole and exclusive remedies in the event of any claimed default.

## 36. ATTORNEYS' FEES.

Each party to this Agreement will bear its own costs (including attorneys' fees) incurred in connection with any litigation, arbitration[,] or similar proceeding between the parties arising out of a dispute related to this Agreement, the Property or the transactions contemplated by this Agreement. Each party waives rights to recover attorney[] fees and other costs, if any, that otherwise would be available by statute or as a matter of law.

Additionally, the Agreement expressed that time was of the essence as to each and every provision of the contract, and it contained a merger clause and a waiver of a jury trial.

After the Agreement was signed by James Timothy Robinson on behalf of DonRob and Jeff D. Warshaw on behalf of 360, the parties amended the agreement to include terms regarding the construction of two new roads across the property ("Road Amendment") in order to comply with City rezoning requirements. Warshaw deposed that two roadways were being built: an access road and "New Road A." New Road A was set to run south and then west along the outer edge of all three parcels between two existing roads and behind an unrelated subdivision. The access road would then be built between New Road A and the major road to the south of the parcels, intersecting between 360's apartment parcel to the east and DonRob's commercial parcel to the west.

The Road Amendment required 360 to construct the New Road A at its sole expense, it contemplated that New Road A would be dedicated to the City "upon completion" and DonRob would not receive any additional payment in relation to the road, and the parties acknowledged the need to work together regarding construction planning and easements for building the road. The parties were "to formulate details

7

of a joint development plan and memorialize those details in writing prior to the Closing." With regard to "mutual easements required for access, construction, and construction staging," the parties agreed to "enter into mutually agreeable agreements."

The Road Amendment contained a number of provisions regarding construction, including a requirement that the parties must work together to mutually agree upon details, including "drainage and retainage," "[c]omprehensive utility planning for water, sewer, gas, and electricity," and that the parties would "mutually agree on the design and elevation of the access points to [the commercial portion of DonRob's property] from the 'Access Road' end from the Round About access on [the existing road], . . . which agreement shall not be unreasonably withheld or delayed." The Road Amendment noted that the roads must comply with City requirements, and the rezoning order for the City listed a number of more specific provisions.

By early 2019, the parties' working relationship was rocky, with members of DonRob frustrated at 360's failure to share documentation with them and "bullying" negotiation tactics, while 360's representatives were frustrated at DonRob's refusal to attend in-person meetings and fully communicate about the final details of the

necessary documentation with regard to the temporary and permanent road construction easements, the plat,[4] and documentation related to the City's dedication of the New Road A. Additionally, 360 worked with its investors, who were heavily involved in revising the documentation as requirements for funding the project. By at least February 2019, DonRob requested that 360 obtain a performance bond for construction of New Road A and a letter from the City acknowledging dedication of New Road A and that other details be finalized.[5]

On April 4, 2019, DonRob emailed 360 to express that it had not received the final closing package, that there were many documents that had not been finalized, and that they could not have new items given at closing because they needed to be approved by the partnership prior to closing. On April 5, 360 emailed closing documents to DonRob. The day prior to closing, the parties met and discussed the outstanding items, including construction and costs of the sidewalks along Road A,

---

[4] Warshaw deposed that the plat would need to be signed off on by City officials and filed according to County regulations.

[5] DonRob's broker deposed that DonRob wanted the City to accept the right-of-way for the land upon which the road would be built (so that DonRob would not have any liability during the construction process) and for 360 to obtain a performance bond to ensure the road would be built. Typically, the broker understood that dedications did not occur prior to the construction of the road, but that the City could accept the land prior to the construction.

commercial vehicle use of the access road, location of the sewer in relation to Road A, duration and timing of the performance bond, temporary easement issues, plat issues raised by DonRob, and the City's dedication of the road. Warshaw secretly recorded this meeting because he had come to be distrustful of DonRob due to his perceived lack of communication on its part, but 360 capitulated to all of DonRob's requests at the meeting except the request that 360 be responsible for constructing a water line with New Road A. DonRob filed into evidence a transcribed copy of the secret recording of the April 8 meeting, which evinced satisfaction between the parties near the end of the meeting. The parties agreed that they believed there was a consensus on the easements and plat by the end of the day, and revised copies of those items were sent to DonRob by 360 late that evening, including both copies with redlines with changes and clean copies for signatures.

DonRob responded to the emails the morning of closing on April 9, stating that it was taking a look at the revisions and would be in touch. Around 12:15 p.m., DonRob emailed about an issue that they had found in the legal description as compared to the plat. Around 3:15 p.m., DonRob emailed 360 that it was finalizing changes to the easement and asked about the letter from the City regarding dedication of New Road A and the performance bond for the road.

By 3:59 p.m. on April 9, 360 delivered into escrow with First American Title Insurance Company documents including the assignment agreement from one 360 entity to another, the closing statements, the "Temporary Construction and Access Easement Agreement (New Road A)," and the "Easement Agreement for Access and Construction Relating to Access Road." 360 emailed DonRob and explained that all the documents and purchase money were available with the escrow agent and that 360 was "ready, willing, and able" to close, but because the wire deadline was 4:30 p.m., they could also move the closing to the following day if necessary.

Rather than close on the sale, at 5:21 p.m., DonRob responded to 360's email stating that 360 had failed to provide all the necessary documents sufficiently prior to closing for DonRob to complete a proper review. DonRob contended that this failure constituted a breach of the Agreement, and representatives from the company did not appear at the closing. The following day, April 10, 360 emailed DonRob regarding the documentation and reiterated that it could complete those documents to DonRob's satisfaction in a timely manner and that the money was with the escrow agent for closing. That same day, however, DonRob sent a letter to the escrow agent stating that 360 breached the Agreement by failing to present the necessary documentation prior to closing and demanded payment of the earnest money.

Two days after the scheduled closing, on April 11, 360 filed suit for specific performance, breach of contract resulting in at least $1 million in damages, and undue enrichment for the approximately $1.5 million in improvements to the parcel including rezoning and other work. DonRob answered, arguing that 360 was in breach of the Agreement at the time of closing by failing to complete the necessary documentation and come to mutual agreements on various aspects of utility and road construction according to the Road Amendment. DonRob also counterclaimed for breach of contract.

Robinson deposed that DonRob "thought we had an agreement, but evidently we didn't because the paperwork they sent back the day of closing did not reflect what we talked about the day before." For instance, Robinson deposed that 360 did not send the agreed upon performance bond until 4:00 p.m. on August 9, which consisted of a handwritten document purporting to be the performance bond. The performance bond was important to DonRob because it did not want to be responsible for building the road as required to develop the entire parcel, including the portion being purchased by 360. Additionally, neither a City-required water line, nor the 60-foot commercial cut that 360 had agreed to provide in the road were included in the documentation. Robinson explained that 360 deviated from original plans regarding

12

the road, road cuts, temporary construction easement, road maintenance, and drainage. Another issue was the lack of the City's letter acknowledging donation for the roadway property, performance bond and the temporary easement; essentially, DonRob believed that the issues would result in the road building falling onto them rather than being handled by 360. Robinson deposed that they did not receive the documents necessary to close until approximately 4:00 p.m. on April 9, and 360 did not incorporate the appropriate changes, so DonRob could not close.

360 moved for partial summary judgment as to its claim of specific performance and as to DonRob's counterclaim for breach of contract. DonRob responded and also moved for summary judgment on its counterclaim and all of 360's claims against it.

After the parties waived a hearing on the summary judgment motions, the trial court granted 360's motion for partial summary judgment, denied DonRob's motion for summary judgment, and denied DonRob's outstanding Motion to Strike the Affidavit of Michael Konig, Motion to Strike the Affidavit of Jeff Warshaw, Motion to Exclude the Testimony of Expert Marc Pollack, and Motion to Compel. The trial court adopted in their entirety each of the proposed orders prepared by 360 regarding the various motions, and this appeal followed.

13

1. DonRob first argues that the trial court erred by granting summary judgment as to 360's claim for specific performance because 360 failed to make an unconditional tender of the purchase money and because 360 also failed to fulfill other obligations under the contract prior to the closing.

> [In Georgia, t]he cardinal rule of [contract] construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction. Further, the construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part. Moreover, no construction is required or even permitted when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation. It is well established that a court should avoid an interpretation of a contract which renders portions of the language of the contract meaningless. Further, Georgia law imposes on both parties an implied duty of good faith in carrying out the mutual promises of the contract.[6]

"It is well established that so long as the contract for the sale of land is in writing, signed by the other party, is certain and fair, for adequate consideration, and

---

[6] (Citations and punctuation omitted.) *Homelife Communities Group v. Rosebud Park, LLC*, 280 Ga. App. 120, 122 (633 SE2d 423) (2006).

14

capable of being performed, a court of equity can decree that it be specifically performed."[7]

It is a well recognized equitable maxim that to receive equity one must do equity. A party seeking specific performance of a contract must show substantial compliance with his part of the agreement in order to be entitled to a decree. In order to support a suit by a purchaser for specific performance of a contract for the purchase and sale of land, the purchaser must have paid the purchase money in accordance with the terms of the contract, or made an unconditional tender thereof before the institution of the action. . . . The party seeking specific performance must not only show that he has complied with the terms of the contract at the commencement of the suit, but also that he is able, ready[,] and willing to do those other future acts which are required of him under the contract.[8]

---

[7] (Punctuation omitted.) *Fox Run Properties, LLC v. Murray*, 288 Ga. App. 568, 573 (2) (b) (654 SE2d 676) (2007), quoting *Bourke v. Webb*, 277 Ga. App. 749, 751 (1) (627 SE2d 454) (2006).

[8] (Citations omitted.) *Kirk v. First Ga. Investment Corp.*, 239 Ga. 171, 173-174 (236 SE2d 254) (1977), citing *Pope v. Cole*, 223 Ga. 448, 449 (2) (156 SE2d 36) (1967); *Jolly v. Jones*, 201 Ga. 532 (1) (40 SE2d 558) (1946).

If the seller declares that tender would be rejected, however, it is unnecessary for the buyer to actually tender the purchase money because "[e]quity will not require a useless formality."[9]

Relying on *Terry v. Keim*[10] and other cases, DonRob contends that 360 had not made an unconditional tender of the purchase money because its payment was conditioned on DonRob signing closing documents prior to releasing the funds from the escrow account.[11] We need not reach the question of whether the funds deposited

---

[9] (Punctuation omitted.) *McLoon v. McLoon*, 220 Ga. 18, 20 (2) (a) (136 SE2d 740) (1964) (holding that unconditional tender requirement was unnecessary to enforce specific performance of a sales option because seller made clear it would not accept the purchase money).

[10] 122 Ga. 43, 44 (49 SE 736) (1905). See also *Burns v. Reves*, 217 Ga. App. 316, 317 (1) (457 SE2d 178) (1995) (holding that intent to exercise an option to purchase real property on the contingency of obtaining financing that is not secured during the opinion period is not sufficient to support claim for specific performance for breach of contract).

[11] See, e.g., *Thakker v. Bay Point Capital Partners, LP*, Case No. 15-58440-WLH, at *14-16 (III) (b) (2018 Bankr. LEXIS 71) (Bankr. N.D. Ga. Jan. 12, 2018) (explaining that Plaintiffs did not make an unconditional tender such that specific performance was required because Plaintiffs "did not actually produce certified funds or cash. Instead, Plaintiffs stated the funds were held in escrow and readily available. Plaintiffs never presented any proof that the funds were in escrow. Likewise, Plaintiffs never disclosed the terms upon which the funds would be released from escrow. Further, the release of funds to Bay Point CP was conditioned on receipt of a written acknowledgment that Bay Point CP will accept the tender.").

16

into escrow and available for wiring after producing all necessary and signed closing documents meets the requirement of "unconditional tender" because DonRob already had stated that it would not close on the Agreement because of its belief that 360 had breached the Agreement by failing to provide certain documents, namely the performance bond for New Road A, the letter of dedication from the City, the corrected easements, and the corrected plat and legal description. Thus, it was futile for 360 to make an unconditional tender because DonRob refused to close.[12]

As we previously noted, "[t]he party seeking specific performance must not only show that he has complied with the terms of the contract at the commencement of the suit, but also that he is able, ready[,] and willing to do those other future acts which are required of him under the contract." Here, DonRob contends that 360's failure to provide the necessary documents by the closing date excused its failure to close the transaction and bars specific performance. We agree with DonRob that the Agreement contained a broad requirement that 360 provide at closing "[s]uch other instruments, documents, affidavits, closing statements, certificates, or agreements

---

[12] See, e.g., *McLoon*, 220 Ga. at 20 (2) (a). See also *Smith v. Standard Oil Co.*, 226 Ga. 339, 340 (1) (175 SE2d 14) (1970) (explaining that "tender by the vendee before suit is excused if the vendor, by conduct or declaration, proclaims that if a tender should be made, acceptance would be refused").

17

reasonably requested by [DonRob's] counsel." But we do not agree that any failure by 360 regarding these four documents resulted in a breach of the Agreement.[13]

Two of the documents that DonRob claims were missing at closing were the performance bond for New Road A and the letter from the City regarding dedication of New Road A. These two documents were not required under the contract, and there is no provision therein that explicitly required 360 provide them to DonRob prior to closing after it agreed to do so during negotiations. Although the parties were required to work together to facilitate dedication of New Road A to the City, there was no requirement in the Road Amendment for acquisition of the letter from the City prior to closing or that it contain the precise language requested by DonRob. To the extent that 360 chose to obtain the performance bond, its failure to have it completed was not a breach because no bond was required by the Agreement. Based on the language of the rezoning provision and the Road Amendment, the easement language and the plat discrepancies should have been completed and resolved, but the parties had agreed to the final language of those items and simply had to properly

_____

[13] Nor do we agree that holding an escrow closing was a violation of the Agreement. Based on the record and language of the contract, 360 substantially complied with the terms regarding closing with regard to the material points. See *Kirk*, 239 Ga. at 172-173 ("[a] party seeking specific performance must show substantial compliance with his part of the agreement . . .").

18

memorialize the changes. Nevertheless, this Court "favor[s] a construction that upholds the contract 'in whole and in every part,' and look[s] at the whole contract in construing any part. . . . [And if] a provision specifically addresses the issue in question, it prevails over any conflicting general language."[14]

The documents provided by 360 constituted "substantially all the Closing Documents evidencing the consummation of the transactions provided for in" the Agreement and those "reasonably necessary" to implement the Agreement. And even if 360 had been unable to complete the necessary changes to the easements and plat on April 9 (and from the record we discern no specific evidence that they did not), the Agreement provided for ten days within which 360 could cure the issue.[15]

---

[14] *Woody's Steaks v. Pastoria*, 261 Ga. App. 815, 817 (1) (584 SE2d 41) (2003), citing *Deep Six, Inc. v. Abernathy*, 246 Ga. App. 71, 74 (2) (538 SEd 886) (2000).

[15] We do not find that the specific provision allowing for ten days to cure in the event of a breach by the purchaser to be in derogation of the requirement that called for the final day of closing to be April 9 or the "time is of the essence" clause. The time to cure any deficiencies resulting in a breach began to run at the latest on April 9, giving meaning to all these clauses. Compare *Chowhan v. Miller*, 283 Ga. App. 749, 751 (642 SE2d 428) (2007) ("'If a contract for the sale of land expressly provides that time is of the essence, the buyer's failure to tender the purchase price by the specified date is a bar to his action for specific performance.'"), quoting *Benedict v. Snead*, 271 Ga. 585 (519 SE2d 905) (1999).

Accordingly, the trial court properly granted summary judgment in favor of 360 with the caveat that the trial court must direct 360 to include the corrected easements and plat with the other closing documents it submits to DonRob.

2. Next, DonRob argues that the trial court erred by finding that the purchase and sale contract allowed monetary damages in addition to specific performance. We agree.

In its complaint, 360 argued that it had suffered at least $1 million in damages, including damage to its reputation with investors, as a result of DonRob's breach of the Agreement. Relying on *Gwinnett County v. Old Peachtree Partners, LLC*,[16] 360 argues that it is allowed to collect incidental damages in addition to specific performance of the contract.

---

[16] 329 Ga. App. 540 (764 SE2d 193) (2014) (allowing collection of prejudgment interest under OCGA § 7-4-15 as well as incidental damages in addition to the award of specific performance), quoting *Golden v. Frazier*, 244 Ga. 685, 688 (3) (261 SE2d 703) (1979) ("[S]pecific performance at the end of a protracted litigation under compulsion is practically never full performance of the contract; instead, there has been an extensive and injurious partial breach. In such a case, the court should decree the payment of damages for the partial breach that has already occurred, even though obedience of the decree will prevent the commission of further breaches.").

The seller's default provision of the contract stated that "[t]he remedies set forth [t]herein are the Purchaser's *sole and exclusive remedies* in the event of any claimed default."[17] Moreover, the provision stated that

> [i]n the event that . . . Seller defaults in any material respect in its performance of this Agreement, and said default shall remain in default for more than ten (10) Business Days after Seller receives specific notice of such default, then and in that event, Purchaser shall have the right to elect between the following options: (a) to declare this Agreement terminated and of no further force and effect, in which event Escrow Agent shall promptly refund to Purchaser all of the Earnest Money, or (b) maintain an action against Seller for specific performance of this Agreement. *In the event that the remedy of specific performance is not available because of any willful or intentional act of Seller* committed after the effective date of this Agreement and prior to the deadline date for Closing established in Paragraph 5 above, *then, and in such event, Purchaser may seek to recover from Seller out-of-pocket expenses* incurred in connection with the negotiation and preparation of this Agreement, due diligence investigations and reviews, proposals, surveys, site plans, environmental assessments and rezoning expenses, all of which shall be capped at . . . $250,000[]. *The remedies set forth herein are the Purchaser's sole and exclusive remedies in the event of any claimed default.*[18]

---

[17] (Emphasis supplied.)

[18] (Emphasis supplied.)

21

Additionally, paragraph 36 of the Agreement addressed the parties' ability to recover costs or attorney fees:

Each party to this Agreement will bear its own costs (including attorney[] fees) incurred in connection with *any litigation*, arbitration[,] or similar proceeding between the parties arising out of a dispute related to this Agreement, the Property or the transactions contemplated by this Agreement. *Each party waives rights to recover attorney[] fees and other costs, if any, that otherwise would be available by statute or as a matter of law.*[19]

The language of the Agreement is clear.[20] 360 had two options: (1) to terminate the Agreement and recover its earnest money, or (2) seek specific performance; only if specific performance is not available can 360 recover damages capped at $250,000. If the parties agreed to include the recovery of both specific performance and monetary damages for 360, or if the parties agreed to include damages beyond $250,000 for 360 (in the event that specific performance was not available), then they could have included such remedies in the Agreement. Instead, 360 contracted to limit

---

[19] (Emphasis supplied.)

[20] See *Homelife Communities Group*, 280 Ga. App. at 122 ("no construction is required or even permitted when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation").

DonRob's exposure[21] by agreeing that "[t]he remedies set forth herein are the Purchaser's sole and exclusive remedies in the event of any claimed default."[22]

While the general rule of our case law may allow parties to recover incidental damages in addition to being awarded specific performance of a contract,[23] "[p]arties to a contract may agree to limit the amount of damages due if the contract is breached, and [they] are bound by that agreement."[24] If "the language of an agreement is plain and unambiguous, the court must afford its literal meaning, despite a party's contention that [it] understood the contract to mean something else."[25] The language of the contract is clear: 360 is barred from recovering attorney fees and costs of

---

[21] 360 was similarly limited in their exposure to DonRob in the event of 360's breach.

[22] Compare *Sofran Peachtree City LLC v. Peachtree City Holdings, LLC*, 250 Ga. App. 46, 51 (550 SE2d 429) (2001) (interpreting the provision of a contract stating that specified parties "shall have the exclusive right and shall be entitled forthwith to full and adequate relief by injunction, specific performance, damages[,] and all other available legal and equitable remedies from the consequences of such breach.").

[23] See *Old Peachtree Partners, LLC*, 329 Ga. App. at 540; *Golden*, 244 Ga. at 688 (3).

[24] *Lancaster v. Storage USA Partnership, LP*, 300 Ga. App. 567, 571 (3) (685 SE2d 474) (2009).

[25] (Citations and footnote omitted.) *Sofran Peachtree City*, 250 Ga. App. at 50.

litigation or any incidental or other damages besides specific performance. Therefore, the trial court erred by allowing 360's damages claim to go forward after ordering specific performance under the contract.[26] Accordingly, we reverse in part the trial court's order as to this issue.

3. Based on our holdings in Division 1, we likewise affirm the trial court's grant of summary judgment to 360 as to DonRob's breach of contract claim.

4. Finally, we need not address DonRob's final enumeration of error as to its other motions in light of Divisions 1 and 2.

*Judgment affirmed in part and reversed in part. Reese and Brown, JJ., concur.*

---

[26] We note that this holding does not affect the specific performance of payments required of DonRob in the contract itself, including legal fees, costs, and expenses of rezoning counsel; survey costs; closing costs; and broker commissions to the extent that those items have not been paid previously.